WILLIAMS *v.* THE STATE.

At common law, the jury were, in criminal cases, the exclusive judges of the evidence; but they were bound to believe the law to be as the Court stated it in the charge.

But the constitution of 1851 (art. 1, § 19), changed the rule; the jury are now the exclusive judges of the law and the evidence.

APPEAL from the *Monroe* Circuit Court.

DAVISON, J.—Indictment for grand larceny. Verdict against the defendant; upon which the Court, having refused a new trial, rendered judgment.

The evidence being closed, the defendant moved to instruct the jury as follows:

" By the constitution of this state, the jury in criminal cases are the judges both of the law and the facts."

This instruction was refused; but the Court gave the following:

" You are the exclusive judges of the evidence, and may determine the law; but it is as much your duty to believe the law to be as charged to you by the Court, as it is your sworn duty to determine the evidence."

Whether, at common law, the jury in criminal cases are the judges of the law of the case, is a question which has been often before this Court; and it must be conceded that its adjudications on the subject are not uniform.

*Margin notes:*

May Term, 1858.

WILLIAMS v. THE STATE.

Wednesday, June 23.

*Townsend* v. *The State*, 2 Blackf. 151, decides that the jury are the judges of the facts, both in civil and criminal cases, but that they are not, in either, the judges of the law; that they are bound to find the law as propounded by the Court; and though they may find a general verdict, including both the law and the facts, still, if in such verdict they find the law contrary to the instructions of the Court, they thereby violate their oath.

But this decision is, in éffect, overruled by *Warren* v. *The State*, 4 Blackf. 150. There, the Court held affirmatively that, in an indictment for larceny, the jury have the right to determine the law as well as the facts of the case.

In *Carter* v. *The State*, 2 Ind. R. 617, the Circuit Court had charged that the jury were the judges of the law and the facts; but that it was their duty to believe the law to be as laid down by the Court. This charge was sustained; and in the opinion delivered, the Court say: "Taken altogether, the instruction expresses the law. It informs the jury that it is in their power to find a general verdict or guilty or not guilty, as they please, upon the whole case, and at the same time admonishes them that duty dictates that they should take the law from the Court." The position thus assumed is substantially the same as that taken in *Townsend* v. *The State*, viz., that the jury, though they may find a general verdict including both the law and the facts, are still bound in duty—which means their duty as jurors—their sworn duty—to find the law as propounded to them by the Court.

This exposition is no doubt correct. Mr. *Wharton*, in his treatise on Criminal Law, says: "In *England*, it has always been held that the Court were as much the judges of law in criminal as in civil cases, with the qualification that owing to the peculiar doctrine of *autrefois acquit*, a criminal acquitted could not be overhauled."

And in this country the same rule of decision is sustained by a weight of authority which seems to be conclusive. *United States* v. *Battiste*, 2 Sumner, 243.—*Commonwealth* v. *Porter*, 10 Met. 262.—*Pierce* v. *The State*, 13 N. Hamp. R. 536.—*Carpenter* v. *The People*, 8 Barb. 603.

But the question before us does not rest upon common-law rule. The constitution (art. 1, § 19), says: "In all criminal cases whatever, the jury shall have the right to determine the law and the facts." Hence, it will at once be seen that the jury, in the cases to which the section refers, are now at liberty to settle the law for themselves; and the result is, that an instruction of the Court in any degree tending to impair their right so to determine the law, would be objectionable; because the party accused has an undoubted right to have the law of his case settled in accordance with the established rules of criminal procedure.

How, then, stands the case upon the record? The jury were told—"You are the exclusive judges of the evidence, and may determine the law." Thus far, the instruction, in effect, concedes their right to adjudge the law; but its concluding branch, viz., "It is as much your duty to believe the law to be as charged to you by the Court, as it is your sworn duty to determine the evidence,"—renders the instruction erroneous; because the whole, taken together, states the common-law rule which, as we have shown, is in direct conflict with § 19, art. 1, of the constitution.

Evidently it was not, in the sense of the instruction, their duty to believe the law as charged by the Court—otherwise they could have had no right to determine it themselves. The instruction cannot be sustained.

But we have a statute which requires the Court, in its charge to the jury in criminal cases, to state "all matters of law necessary for their information in giving ther verdict." 2 R. S. p. 376. It is insisted that this enactment conflicts with the constitution; but we are not of that opinion. It simply confers upon the Court an advisory power —directs the judge to inform the jury as to the law of the case; and though it may be their duty to respect and give due consideration to the opinion of the Court on questions of law applicable to the facts proved, still the statute does not, either in terms or by implication, deprive the jury of their right, under the constitution, to determine the law.

*Lynch* v. *The State*, 9 Ind. R. 541.—*Daily* v. *The State*, at the present term (1).

Hanna, J.—In the opinion pronounced by the Court, in this case, I cannot concur, for the reason that it is in my opinion calculated to subvert the system of jurisprudence which has heretofore prevailed in this state, and defeat the ends of justice.

The decision is, in effect, placing in the hands of a jury the unlimited and unrestrained power to find a defendant guilty or not guilty, without regard to law or evidence. This is stating the case strongly, but no stronger than the conclusion arrived at by the Court will warrant. And still more, in cases of improper convictions, the presiding judge would yet have the right, until it is decided otherwise, to grant new trials, whilst, upon an improper acquittal, there is no redress for violated law. Law is said by writers to be a rule of action. It should be fixed, then. If each jury decide for themselves what the law is, there can be no fixed rule—no rule at all—upon any subject. The decisions will vary according to the views of different juries.

In the case at bar, the instruction now held to be erroneous is as follows:

"You are the exclusive judges of the evidence, and may determine the law; but it is as much your duty to believe the law to be as charged to you by the Court, as it is your sworn duty to determine the evidence."

The first branch of this instruction embodies the statutory and constitutional rights of the jury, to-wit, that they are the exclusive judges of the evidence—of all questions of fact (2 R. S. p. 376, § 113)—and that they may determine the law. Constitution, art. 1, § 19. The latter branch of the instruction, it is assumed, limits them in the exercise of the right, in the full extent to which by the constitution they are authorized to exercise it, in determining upon the law. Let us see whether the language used will bear that construction. The jury were informed that it was as much their duty to believe the law to be as charged by the

Court, as it was their sworn duty to decide upon the evidence. Now, they had just been told that they had full power to determine upon the evidence—that they were the exclusive judges thereof. This evidence they received from the witnesses, and might give greater credit to one than another—might credit or discredit a particular witness. So, just the same legal exercise of judgment and discrimination that was used in determining upon the weight that should be given to the testimony of particular witnesses, was in like manner to be exercised in weighing the instructions given by the Court—no more, no less. They might believe the witnesses or disbelieve them; but certainly it was their duty to believe each one had sworn honestly and truly, if they could reconcile it with their conscience and the other testimony to so believe. Precisely to the same extent, they were called upon to believe that the tribunal, whose duty it was to give them the law in charge, had done so properly and correctly. The Court did not say to them that they were absolutely to take the law from the Court, but that in considering the case it was as much their duty to believe that the Court had correctly stated the principles of law governing that case, as it was their duty to believe that witnesses had correctly stated the facts. This was subservient, too, to the general statement which had, in the same sentence, been made to them—that they were the exclusive judges of those facts, and might determine the law. How determine it? Determine it after giving due weight to the charge of the Court as to what that law was. Not that they had the right to disregard such instructions, without having first weighed and considered them—not that they had the right to cast aside any portion of the testimony, without weighing and considering it; but that it was alike their duty to consider the testimony, as detailed by the witnesses, and the charges, as given by the Court; because it was the duty of the one to give the testimony, and of the other to charge the law. They might, after such consideration, say, "this testimony is not evidence;" and, perhaps, might say, "this charge is the law, but is not applicable to the facts proved in the case." But it is a ruling

that may possibly lead to unfortunate results, to hold, even in effect, that a jury can, without investigation, cast aside the one, or disregard the other.

When a man is indicted, he has a right to a speedy and fair trial, according to the known and long-established rules of law governing in such cases, and he should not be tried by any other standard; a jury should not be at liberty to shorten or lengthen it, either in requiring more or less evidence, as their whim or caprice may dictate, or by laying down unwholesome legal principles. The safety of every citizen demands this. A jury may return a verdict of guilty, without giving a reason therefor, and such verdict may be, by them, based upon an entirely wrong construction of the law. Where would be the remedy? How could you know what operated upon their minds? The Court may lay down the law in a charge. Counsel may except, and if the charge is wrong have the benefit of the exception. But if the jury are to be the sole arbiters, they may wrongfully lay down the law in a secret jury room, convict the defendant, and cause him to be executed—executed for the reason that the whole case might properly turn upon the conclusion of the jury as to a doubtful state of facts—and a new trial might be refused by the Court, under the supposition that such doubtful state of facts had been found against him by the jury, and, without knowing that such point of fact was found in his favor, but a wrong conclusion as to the *law* arrived at by them in their secret conference.

It would appear that a plain statement of a case, properly involved in this decision, ought to refute the position taken. Suppose a jury should return a verdict of guilty against a man accused of a heinous offense. Suppose the evidence to be perfectly clear—overwhelming—and that in the charges every principle of law governing the case is clearly and properly laid down, but in commenting upon the powers and duties of the jury, the same statement should be made by the judge as in this case; would the Court, believing the verdict to be right by the evidence—right by the law—and that the man ought to be convicted,

—reverse the case because in these comments the judge may have so far blinded and misled the jury as to induce them to return a correct verdict,—and, therefore, set it aside?

This is not a strained construction of this decision, but a correct exposition of its doctrines, when carried to their legitimate conclusion.

Again, if this unchecked right of determining the law exists in the jury as to matters arising upon the trial, is it limited or unlimited? If unlimited, then the jury might pass upon the validity of the indictment, or the legality of any other portion of the record. But this Court has decided, in the case of *Daily* v. *The State*, at this term, that such is not the province of the jury. But I insist that the legitimate consequence of the doctrines of the Court in this case, when carried out, would give the jury the same power to determine the law upon one as well as another branch of the case—upon the record as well as the evidence.

It is conceded by my brother judges that the case of *Carter* v. *The State*, 2 Ind. R. 617, was, at that time, a proper exposition of the law—and why? Because it was in accordance with the common law, which was in force here, and which secured the right of trial by jury in a Court, and subject to the control of a judge, as to the admission of evidence and charging the law to the jury. It did not contemplate that the jury should try the case out of a Court, and independent of the supervision of a judge, supposed to be learned in the law, as to the reception of evidence, and as to the exposition of legal questions.

This *Carter* case is in like manner in accordance with the practice, in our federal Courts, under the constitution of the *United States*. That instrument, in all criminal prosecutions, secures to the accused the right to a speedy and public trial by an impartial jury (Const. *U. S.*, art. 3, § 2, and art. 6 of the amendments); and yet but seldom since the impeachment of Judge Chase has it been maintained that a jury, under those provisions could act independently of the Court; but to the reverse, it is now the daily prac-

tice for the Court to give them the law, and they determine the facts.

The record in the *Carter* case shows that the defendant asked the Court to instruct the jury that "the jury are the judges of the law and the facts, and can find their verdict accordingly; which the Court refused to give in terms, but gave it with the following qualifications, to-wit: 'The jury are the judges of the law and the facts, and can find their verdict accordingly; but you are to believe the law as laid down by the Court to be the law of the land.'"

Here was a positive injunction laid upon the jury to take the law from the Court, absolutely—not to the same extent that they might determine the facts, but unqualifiedly and without reserve—stronger, much stronger, than the charge in the case at bar; and that instruction was approved by this Court, and the judgment against the man affirmed.

But it is said that the new constitution has abrogated the rule of practice which prevailed at the time of that decision, which was in 1851, and that although that rule of practice was then right, yet that a new era has dawned upon us, or rather upon juries, since the adoption of this new constitution in 1851.

Let us examine this question. Here, it might be premised that if the framers of that instrument had intended to work so radical a change in the practice of administering the laws as to make the jury omnipotent and the judge a mere automaton to record their findings, it is rather strange that so great a change should not have been talked about by them, and so held by some of our numerous judges, in the multiplicity of constitutional questions investigated in the five years past. It is believed that it was not the intention of the framers of the constitution, by the adoption of the section relied on, to institute such entire change. That section is as follows:

"Sec. 19. In all criminal cases whatever, the jury shall have the right to determine the law and the facts." 1 R. S. p. 44.

That belief is in accordance with the former decisions of

this Court, since 1852, upon the point involved; to-wit, in the case of *Driskill* v. *The State*, *Rice* v. *The State* and *Stocking* v. *The State*, which were convictions for murder in the first degree, and in each of which the decision in the *Carter* case is approvingly alluded to, either directly or indirectly, the convictions maintained, and the men executed. The record in the case of *Stocking* v. *The State*, points out as one of the erroneous rulings of the Court, that the instructions abridged the constitutional privilege of the jury, and misled them as to their right to determine the law under the constitution, and refers to 1 R. S. p. 44, § 19—thus pointing out the section upon which this decision is now made to rest. And the argument then made by counsel was, that the *Carter* case was based upon the common law and the old constitution, and was then correct; but that the new constitution vested in the jury the power to determine the law as well as the facts, even in "opposition to the Court's instructions," &c. In alluding to the instructions, judge Stuart says: "This instruction is correct. It is far less objectionable than this Court has sustained. *Carter* v. *The State*, 2 Ind. R. 617. There the instruction was, that it was 'the duty of the jury to believe the law as laid down by the Court,' and it was held to be correct." So in *Rice* v. *The State*, Judge Perkins says: "We shall say nothing upon the subject of the charge of the Court to the jury. It has been held in *Driskill* v. *The State*, at this term, that such a charge is not erroneous." In *Driskill* v. *The State*, referred to, Judge *Pettit* had instructed the jury that "in this and all criminal cases the jury has a right to judge of the law and the facts; but it is the duty of the Court to instruct them as to what the law is, and it is proper for them to respect and take for law what the Court declares it to be." It was contended that the part of this instruction which advised the jury that it was "proper," &c., to the end of the sentence, was wrong. Judge Davison says: "The point involved in this position has been decided. *Carter* v. *The State*, 2 Ind. R. 617, was an indictment for murder. In that case the Court instructed the jury that they were, &c. *Held*,

that the instruction was right. This case is, in our opinion, a correct exposition of the law, and is decisive of the question under consideration." Here, not only the instruction of Judge *Pettit* is held to be correct, and which it is not intended to call in question now, but the case of *Carter* is referred to as being at that time, to-wit, in 1855, a correct exposition of the law. It is evident, then, that up to that time the construction now placed upon the new constitution, had not been maintained by this Court. And the question is, ought it to be?

In determining this question we should look to some other decisions, &c. In *Murphy* v. *The State*, 6 Ind. R. 490, and *Lynch* v. *The State*, 9 Ind. R. 541, this Court held that the Court trying the case has the power to prevent counsel from reading from law books to the jury. In *Welch* v. *Watts*, this Court held that the Court is bound to instruct the jury. 9 Ind. R. 115. And so is the statute. 2 R. S. p. 110. And so is the statute regulating criminal trials. 2 R. S. pp. 375, 376.

Now, if these decisions are correct, from whence do the jury derive a knowledge of the law that should enable them to come to a correct conclusion in an intricate criminal trial. The Court can refuse to permit attorneys the privilege of reading it in the hearing of the jury. They are authorized, according to this decision, to entirely disregard what the Court may say to them upon the questions of law involved. Are they supposed to have an intuitive knowledge of the law? Is the arbitrary rule and fiction of law to prevail in reference to a juror as in cases affecting a man's personal relations towards society and other men —that he is presumed to know what the law is, and therefore responsible if he violates it? Certainly it will not be argued that the tribunal which holds in its hands the life, the liberty, and the right of property, of every citizen, can arbitrarily dispose of those sacred rights, in blissful ignorance of the principles of law governing their possession and enjoyment. Suppose a case was on trial before a jury who had not made law the subject of reading or reflection, in which the Court should refuse to permit counsel to read

to them the law, and that jury should refuse to pay any heed to the charge of the Court upon the law,—what certainty could there be that the law would be correctly applied? None—however honest the men—unless the fiction is a truth, and no longer a fiction, that every man is presumed to know the law controlling him as an individual, and not only so, but that it applies with equal force to him when acting as a juror, and in pointing out to him law governing the case in hand, as well as his rights and duties as a juror. If this is true, how could such juror, with such intuitive and perfect knowledge of his rights and duties, be misled by a charge directed to a limitation of his rights and privileges, or an increase of his duties? Let us for a moment again advert to the case given, in which it was supposed that the evidence was clear—the charge of the Court upon the law governing the case right—the presumption, under the construction of the constitution maintained in this decision, would be, that the jury had the knowledge and the right to decide the law and the facts of the case correctly,—would that presumption change in a moment, upon the return of a verdict of guilty, because the Court, in charging the jury as to their rights, should say, "it is as much your duty to believe the law to be as charged by the Court as it is your sworn duty to decide upon the evidence," and therefore the law presumes they were misled?

All these considerations lead to but one conclusion, and that is, that it was not the intention of the framers of our constitution to thus uproot the safeguards which had prevailed in the administration of our criminal law; but that Courts should still be organized and held responsible to a superior tribunal for a correct exposition of the law, and juries should be impanneled and have the right to pass upon the facts of every case, and determine the application of the law of the case, as charged by the Court, receiving it as law.

*Per Curiam.*—The judgment is reversed. Cause remanded, &c.

*J. W. Gordon* (2), *A. H. Connor*, *M. C. Hunter* and *P. C. Dunning*, for the appellant.

(1) *Post.*

(2) Mr. *Gordon* submitted the following argument in behalf of the appellant: I shall maintain the following propositions:

I. The jury, in all actions, civil and criminal, at common law, upon general issue joined and submitted to them, had a right to determine the law and the evidence; and in criminal actions this right was absolute—subject to no control nor review.

II. In all criminal cases whatever, the right to determine the law and the evidence is in this state guarantied to the jury by an unequivocal constitutional provision.

*First.* Of the right of the jury in criminal and civil cases at common law, to determine, upon general issue joined, the law and the facts; and of the absolute ultimate quality of this right in criminal cases.

1. This right is shown by the original constitution and history of the jury itself. The *Saxon* jury originated in the Court of the hundred, in which all the hundredors assembled, and determined cases without the direction of any Court, either as to the law or the facts. Subsequently, owing, doubtless, to the inconvenience arising from this mode of trial, the number was limited to twelve men, who were summoned by the sheriff, from the immediate neighborhood where the facts of the case transpired, and found their verdict from their own knowledge. The whole twelve had to agree to the verdict. From this required unanimity, it not unfrequently became difficult to obtain a verdict, and a change was in consequence introduced into the constitution of the jury. This consisted in summoning others, also from the same vicinage, until there were found twelve who could agree. The next change introduced, was that of summoning witnesses, in case the jury could not agree from their own knowledge; and these witnesses retired with the jury when considering of their verdict, and delivered their testimony privately to them. But this method was not satisfactory, and the witnesses were at length brought before the Court, and examined by the parties under the direction of the judges; after which the jury retired to consider of their verdict, and were at liberty still to find upon their own knowledge, disregarding the witnesses altogether; or to find upon the combined strength of their own knowledge and the testimony; or upon the testimony alone without reference to their own knowledge. From the commencement of this examination of witnesses in Court, dates the beginning of our law of evidence. The following authorities are cited in support of the foregoing observations: Hume's Hist. Eng. vol. 1, pp. 71, 72, 73; Laws of Edward the Confessor, c. 2; Guizot's Hist. Rep. Gov. p. 44; 1 Spence's Equity Jurisdiction of the Court of Chancery, pp. 112, 113, and additional note to 3d chap., *id.* pp. 128, 129; 2 Hale's Hist. Com. Law, pp. 134 to 155, inclusive; 3 Black. Com. chap. 33, p. 349; 2 Sullivan's Lectures, 94, 99, 158; 2 Inst., c. 12 Mag. Charta, p. 24; 1 Reeves Hist. Com. Law, p. 86; 11 Henry 4; 1 Stark. Ev. p. 5, note *e*. Wood's Inst. p. 597; Hobart's Rep. 227; 2 Reeves Hist. Com. Law, p. 3 to the end of c. 8.

2. The Courts of *England* had no power at common law to compel the jury

in any case, civil or criminal, to find a special verdict. It was therefore at the option of the jury to find a general or special verdict. If in finding a general verdict they disregarded the instructions of the Court, the judges had no rightful power to set aside the verdict, or to punish the jurors. So far as the Courts were concerned, the finding of the jury, both as to the law and the evidence, was conclusive and final. I do not say that new trials were not grantable in chancery; for upon a proper case made they were. At common law—in the common-law Courts—new trials were not grantable in any case, on account of the erroneous finding of the jury, whether in matters of law or fact. The earliest recorded case of a new trial thus granted, that I have been able to find, dates no farther back than 1648; and *Spence*, in his learned and excellent treatise on the "Equitable Jurisdiction of the Court of Chancery," dates the first new trial at common law no farther back than 1665. Although this is a mistake, yet it serves to show that even then the practice was not generally introduced, and the exceeding scarcity of instances thereof before that time; for none who have examined Mr. *Spence's* book will deny his great research. It was not in the power of the Courts of law to grant new trials; the practice of finding and imprisoning juries for disregarding the directions of the Court was never sanctioned by the common law; and the process of attaint was not at the option of the Court, but of the party injured by the false verdict, to institute. Inasmuch, therefore, as the jury could find a general verdict, at their option, including law and fact, in which they might wholly disregard the Court's direction, and as the Court had no power to call them to account for their finding, they were, as to the Court, judges of the law and the evidence. The want of power in the Courts, either to punish or control them, will be seen by reference to the treatment of *Lilburne's* jury. 2 State Trials, fol. from 69 to 85; *Penn's* jury, *id.* 615, 616; and see, also, *Bushell's* case, Vaughan, 135 to 158; Hume's Hist. Eng. vol. 4, pp. 349, 350.

3. At common law a verdict, false either in fact or in law, could only be set aside by an attaint; and in criminal cases no attaint was allowed.

The process of attaint for false verdict in civil actions,* is defined by *Wood* to have been a writ that "lies against a jury, to examine whether a jury of twelve men gave a false verdict, or contrary to evidence, in a Court of record, upon issue joined, that upon conviction of the jury the judgment following upon it may be reversed." Wood's Inst. p. 608. It lay equally for a verdict false in law, as for one false in fact. Hobart, 227.—2 Sullivan's Lectures, 258.—2 Hale's History Com. Law, 154, 155.—3 Black. Com. p. 378.—2 Inst. p. 130—Com. on c. 14 Stat. Marlb.—*Id.* on c. 38 1 Westm., p. 237.—*Id.* on c. 12 Magna Charta, p. 25.—*Id.* on 2 Edw. 6, c. 13, p. 662.—*Id.* on c. 30 2 Westm., p. 424. The whole subject of attaints is presented in Fitz. Nat. Brev. p. 241 to 253, inclusive. The foregoing authorities show the right of the jury to find a general verdict, both of law and fact; and, also, the consequences which they might bring upon themselves by finding a false verdict—false either in law or fact—in a civil action. The following further authorities also establish that such was their right. Alluding to special verdicts, and to general verdicts with a special case, *Blackstone* says: "But in both these instances, the jury may, if they think proper, take upon themselves to determine, at their own hazard, the complicated question of fact and law,

* It was abolished 6 Geo. 4, c. 59, § 60.

May Term, 1858.

WILLIAMS v. THE STATE.

and without any special verdict or special case may find a verdict absolutely either for the plaintiff or defendant." 3 Black. Com. 378.

And *Littleton* had said before him as much: "If they [the jury] will take upon them the knowledge of the law upon the matter, they may give their verdict generally, as is put in their charge," &c. Lit. on Tenures, § 368, as in 2 Coke thereon, 228, *a* & *b*.

Upon which my lord COKE saith: "Although the jury, if they will take upon them (as LITTLETON says) the knowledge of the law, may give a general verdict, yet it is dangerous for them so to do; for if they do mistake the law, they run into the danger of an attaint; therefore, to find the special matter is the safest way where the case is doubtful," 2 Co. Lit. 228, *a*, *b*.

4. That this was not merely the power, but the right of the jury, according to the common law, is to my mind clear, from the fact that in all cases in the ancient books, and statutes declaratory of the common law, the right to find the facts specially, or a special verdict, is spoken of, and treated as the privilege of the jury, to be exercised or not at their own option. It was doubtless declared by statute for their advantage, that Courts might not compel them to find a general verdict unless they chose to do so. The statute of 2 Westm. is in point. It is there enacted: "*Item. Ordinatum est, quod justiciarii ad assisas capiend. assignati non compellant juratores dicere præcise, si fit disseisina vel non dummodo dicere voluerint veritatem facti, et petere auxilium justic.; sed si sponte velint dicere quod disseisina est, vel non, admittatur eorum sub suo periculo.*" 2 Westm. c. 30. Upon which my lord COKE hath the following commentary: "In the end it hath been resolved, that in all actions personal, real and mixed, and upon all issues joined, general and special, the jury might find the special matter of fact pertinent and tending only to the issues joined; and thereupon pray the discretion of the Court for the law."

I conclude, therefore, that as the jury *might* or *might not* find a special or a general verdict, at their own option, they were judges both of the law and the facts; but if that option, in cases of difficulty, led them to find a special verdict as the more certain method to escape an attaint for a verdict false in law, then they had the privilege of doing so. But this special verdict was, after all, but one of two methods of discharging their duty as jurors, either of which was equally open to them, and therefore equally lawful and right.

5. The criminal jury was never subject to attaint for verdict false in fact or in law; and as they were superior to any rightful control by the Courts, or any just (I mean legal) punishment for disregarding the directions of the Court in such cases, it follows that their power to decide upon the law and the facts in all criminal cases was a rightful, legal power, as already shown; and also an ultimate and final power, which, when once exercised, was subject to no review, and, therefore, to no reversal. Fitz. Nat. Brev., tit. Writ of Attaint, p. 241 to 253. In none of the ancient decisions or treatises of criminal law, as Coke, Foster, etc., do I find any allusion whatever, of an authoritative character, to attaints for false verdict in criminal actions.*

6. But any power, wherever vested by the constitution, and in whomsoever vested, which is thus ultimate; *i. e.*, any power so vested in any functionary,

* Mr. *Gordon* has, since submitting his argument, furnished me a reference to Hale's P. C., where it is said that an attaint might be had for false verdict in a criminal case.—REPORTER.

by the constitution, that the functionary is accountable to no other functionary of the government, for the manner in which he performs the function; and where the function having been exercised, the act itself is subject to no review, or reversal for error; is ultimate, final and rightful, however exercised, at least so far as the constitution vesting the power is concerned. The jury in criminal actions was at common law vested with this ultimate power, at least in all cases of felony. And to admit the power and deny the right, involves all the absurdities arising from an attempt to apply to a man in society, and as a member thereof, the higher law doctrines so much spoken of by honest, well-meaning men, who, nevertheless, in the application of their doctrines to man social —man the citizen—are guilty of a great error in judgment.

It is admitted, that in criminal trials at common law the power of the jury was ultimate and final, whether exercised in acquitting or punishing—in pursuance of the instructions of the Court, or in direct contravention thereof. 4 Black. Comm. 361.—*Lilburne's* case, 2 State Trials, 69 to 85.—*Penn's Jury*, *id.* 615, 616.—*Bushell's* case, Vaughan, 135 to 158; *The United States* v. *Gilbert et al.* 2 Sumner, 19 *et seq.*

It follows, therefore, that the power of the jury being thus ultimate, whether exercised in acquitting or punishing, was at common law, and by the original constitution of the jury, rightful. Nor does the force of this conclusion suffer the slightest diminution from the doctrines relating to special verdicts; for they arose as the privilege of the jury—not to diminish but to enlarge their rights in every case. 2 Westm. c. 30, and Coke's commentary thereon, above cited.

7. If the judges, however, had an exclusive right to determine the law in criminal as well as in civil actions, how does it happen that in criminal practice such a thing as a demurrer to evidence is entirely unknown? What is the reason for this diversity? If the Court and jury sustain the same relation to each class of cases, how does it happen that in civil actions the parties, by demurrer to evidence, can take the case from the jury and refer it to the Court, upon an admitted state of facts, while no one contends for any such right in criminal actions? There is doubtless a reason for the diversity; but what other reason can be found than the right of the parties—the state and defendant —mutually to insist upon having the case resolved by the jury? In *England* it was never in the power of a defendant to compel the king's counsel to join in demurrer to the evidence in a criminal prosecution, nor *vice versa.* It was, also, at the option of the judges to overrule any such demurrer, and compel the parties to go on before the jury. It was, therefore, never the right of either the king or the subject at common law; for a right may always be asserted and maintained in Courts of justice, and in spite of Courts of justice. It is of the essence of a right, that it depends not upon any man's will or permission, but upon the law. 1 Chitty Cr. Law, 626.—5 Co. Rep. 104.—2 H. Black. 187.—Coke on Litt., 72.—2 Phil. Ev. 6th ed. 298. And the same conclusion follows from the rule in *The State* v. *Meade*, 4 Blackf. 309; for if the trial by the Court was void, as being a violation of the right of the state, it seems to be almost precisely the same, if, after going to a jury, the defendant could by demurrer to the evidence take the case from the jury, and submit it to the Court. But if a defendant may not do this as of right, *why?* There can be no other reason, but that either party has a right to have the jury not only find the facts, but

deduce the legal consequences therefrom. And that makes them judges of the law and facts; and is, therefore, all that I contend for in this cause.

8. The right to find a general verdict necessarily implies the right to find—judge—both the law and the facts; for *ex facto oritur jus*. But how shall this take place where the law, which the jury are bound to take from the Court, under pain of being guilty of the crime of perjury, is laid down before the facts are determined, unless we concede to the Court also the right to determine both the facts and the law, and thus abolish all useful functions of the jury, except, perhaps, that of shielding the judges from the responsibility incident to determining both the facts and the law in cases where that duty might become unpleasant? The facts of every case form the germ from which the law grows up—the law is but the plant.

Every judge who has reflected upon the philosophy of any rule of law, knows that it is impossible to state it, without stating also, either expressly or by implication, the facts out of which it arises. Every charge must do this. To assume, therefore, that the jury are bound to find the law to be as the Court "charge it to be," is to assume that they are equally bound to find the facts as they are, either expressly or by necessary and unavoidable implication, embodied in the charge. And that is to take from the jury both the law and the facts—is, in effect, to annihilate every useful function of the jury, where they are bound to give a general verdict.

The most that can be claimed for the charge of any Court prior to verdict found, is that it is an approximation to the rule of law that must govern the very case, under trial, when the jury ascertain it. The charge, therefore, can never become more than an analogy, more or less proximate to the case at bar. To make it anything more, fixes both the law and the facts before the jury retires; and makes them but the echo of the Court. My Lord HALE seemed to have had this view before him, when he wrote his account of the resolution of "all the judges of *England*," in the case of *Wagstaff*, who was fined at *Newgate* for acquitting *Richard Tomson* and others indicted for conventicles. The judgment fining *Wagstaff* alleges that the acquittal of *Tomson* was "*de prædicta transgressione et contemptu contra regem hujus regni angliæ; et contra plenam evidentiam, et contra directionem curiæ in materia legis*," etc. *Wagstaff* and his fellows were for this acquittal committed. He obtained a *habeas corpus*, whereon he was brought before the C. B., "and all the judges of *England* were assembled to consider of the legality of this fine and imprisonment thereupon." HALE then says: "It was agreed by all the judges of *England* (one only dissenting), that this fine was not legally set upon the jury; for they are the judges of matters of fact, and although it was inserted in the fine, that it was *contra directionem curiæ in materiâ legis*, this mended not the matter; for it was impossible any matter of law could come in question till the matters of fact were settled, and stated and agreed to by the jury, and of such matter of fact they were the only competent judges." 2 Hale's Pleas of the Crown, pp. 312, 313. It would be difficult to frame an authority for my proposition more directly in point. It is conclusive, and decisive of the right of juries at common law to determine the law and the evidence—a right so far as the law is concerned, arising from their antecedent and conceded right to determine the facts, and the impossibility of the Court's stating the law before the jury have determined the facts. Neither argument nor authority can add anything to

the force of this position. It stands on the vantage-ground of a self-evident truth.

9. The weight of authority, both legislative and judicial, remains to be considered. Here all the authorities already cited are either directly or incidentally pertinent to our position. Co. Litt. § 368, and commentary thereon.—4 Black. Comm. 361.—*Rex.* v. *Woodfall,* 5 Burr. 2661, with *Junius's* comments thereon, 2 Junius's Letters, p. 84: the reasoning is unanswerable.—2 Wilson's Lectures on the Law, 372.—1 Chit. Cr. Law, 520.—*Henfield's* case, Wharton's Am. State Tr. 87.—*Frier's* case, *id.* 587.—*Callender's* case, *id.* 710.—3 Dall. 4.—4 Mass. R. 25.—1 Baldw. 108.—6 Shep. 346.—2 Campbell's Lord Chief Justices, *in vitâ Mansfield,* 411, 412.—6 Campbell's Lord Chancellors, 190.—*Id.* 340 to 346. —5 *id.* 50 *et seq.*—*Lancey* v. *Bryant,* 30 Maine R. 466.—*The State* v. *Snow,* 6 Shep. *supra.*—*The State* v. *Jones,* 6 Ala. R. 666.—*Warren* v. *The State,* 4 Blackf. 150.—23 Vermont R. 14.—S. C. 2 Leading Crim. Cases, by *Bennett* and *Heard,* 388.—1 Parker's Criminal Cases, 596, 603.—1 Wheeler's Criminal Cases, 108, 221.

It is not denied that there are cases both in *England* and *America* adverse to this doctrine; but it is believed that a careful analysis of the foregoing authorities, and positions already discussed, must satisfy any unbiassed mind that the principle of the law is clearly in favor of the plenary right of the jury as contended for.

The case of the *United States* v. *Battiste,* 2 Sumner, 240, seems to have been the first *American* case against this right. But while it distinctly denies the right, it asserts no authority, and its reasoning is altogether inadmissible, as a moment's reflection will satisfy the Court. The Supreme Court of *Massachusetts* (10 Met. 14, 263) followed in Mr. Justice STORY's wake, and asserted fully the same doctrine; but at the same time, were guilty of the same inconsistency that is so cogently urged against Lord MANSFIELD by *Junius, supra,* viz., denying the right, but admitting the incident—the discussion of the law to the jury.

This right of juries has, however, both in *Europe* and *America,* been frequently asserted by legislative acts, declaring the law to be, as I have in this argument labored to show it was. Thus, 1. Mag. Chart. c. 29, and Lord COKE's commentory thereon, are to my purpose. 2. Mr. *Fox's* libel law (1792) which is a declaratory act, sustains the right of juries at common law, to determine the law and the evidence in that form of criminal cases for which it provides, and incidentally recognizes it in every other. 29 Parl. Hist. pp. 551 to 602.—*Id.* 1293 to 1300.—Opinion of the judges adverse to the right, *id.* 1361 to 1371.—Lord CAMBDEN's speech in favor of the right, *id.* 1404 to 1414.—Further debate upon the bill, from page 1414 to 1431; also from 1534 to 1538. The entire discussion *pro* and *con* is cited, because it is deemed pertinent to the case at bar; and highly interesting, as marking the close of a great struggle for an important popular principle. 1 Chitty Cr. Law, 530.

In the state of *New York,* in 1805, a similar declaratory act was passed; and although the Courts of that state had divided in libel cases before its passage—some of the judges declaring, and others denying the right of the jury to determine the law and the facts—yet they agreed at once, upon its passage, as they had in other criminal cases before done, that the jury were now, in libel cases, the judges of the law and the facts. See BENNETT's dissenting opinion in 23

Vt. R. 14. The *New York* act seems to have been a copy of the *English* act. 3 Johns. Cases, 337.—Bennett & Heard's Leading Cr. Cases, 430 to 431.

The constitution of *Indiana* (1816), while it simply declared that the right of trial by jury should remain, in all civil and criminal cases—with certain unimportant exceptions—inviolate, provided "that in all indictments for libel the jury shall have the right to determine the law and the facts, under the direction of the Court, as in other cases." Const. 1816, art. 1. §§ 5, 10. This, too, is almost, if not altogether, a literal transcript from *Fox's* bill, *supra*. Our Supreme Court, while denying the right of the jury to determine the law in other criminal cases, conceded it in cases of libel prosecutions. *Townsend* v. *The State*, 2 Blackf. 157. BLACKFORD, himself, dissented from all that part of the opinion that denied the right in any criminal case, and doubtless held that the constitution in relation to libel prosecutions was declaratory of the common law, as the libel law of Mr. *Fox*, in *England*, had been held before. But the case of *Townsend* v. *The State* is, upon this point, authority, and stands with force undiminished by any subsequent case, as a construction of this 10th section of the first article of the constitution of 1816, as I shall contend when we come to consider the constitution of 1851.

From these observations I am led to conclude, that the jury at common law were entitled to determine the law and the facts in criminal cases.

*Secondly*. I shall now briefly consider the second branch of the argument, viz.—The right of the jury in all criminal cases whatever, to determine the law and the facts, as it is guarantied to them by the constitution of *Indiana*.

1. The constitution employs the following language: "In all criminal cases whatever the jury shall have the right to determine both the law and the facts." Art. 1, § 19.

This provision is too plain to admit of doubt. Construction and interpretation are unnecessary. It is not possible to conceive language more direct and unequivocal. I regard it as decisive of the question before the Court. Let us contrast this simple provision of the constitution, with Judge HANNA'S charge in the Court below. The learned judge employed the following remarkable language:

"You are the exclusive judges of the evidence, and may determine the law; but it is as much your duty to believe the law to be as charged to you by the Court, as it is your sworn duty to determine the evidence."

Is not this a flat denial of justice, as secured to the citizens of *Indiana*, "in all criminal cases whatever?" Is it not a plain usurpation of the function of the jury by the Court? Is it possible, indeed, to conceive a more palpable denial of right on the one hand, or usurpation on the other? Does not the constitution plainly indicate in the words, "the right," that there is but one constitutional right in the state "to determine the law and the facts?" And does not that instrument, by conferring that right upon the jury "in all criminal cases whatever," inform every other tribunal, that its exercise by it, is an invasion of that function of the jury? How could his Honor have stricken down the right both of the jury and of the citizen by a blow more direct and undisguised? What more forcible language than he employs can be found, to inform the jury that they must either conform to his opinion of the law, or load their consciences with the burthen of perjury? And, if the right to determine the law may be thus taken from the jury, what hinders his Honor from claim-

ing the right to determine the facts also? It manifestly is protected by no higher constitutional security. Indeed, as already shown, the right to determine the law of the case for the jury, before the facts are settled, includes the right also to determine the facts. Hence, the charge was a complete usurpation of both, and left the jury no other rightful function but to echo the opinions of his Honor.

I am aware that the statute provides, that "the Court must charge the jury." 2 R. S. p. 375, § 103; and, again, that "in charging the jury he [the judge] "must state to them all matters of law which are necessary for their information in giving their verdict." *Id.* p. 376, § 113. But these provisions, if consistent with the constitutional provision under consideration, cannot divest the right which it confers upon the jury, nor modify it even; for, so far as one provision of law modifies another, it does conflict with that other. Nothing can, therefore, be claimed in support of the charge of the Circuit Court, from these or any other statutory provisions; for they are all subordinate to the constitution, and, in so far as they might, if of equal authority, tend to modify its provisions, are unconstitutional and void.

But the statute last cited shows plainly that the charge of the Court required by it, must be restricted to matters of law. Hence, if the Court should charge any matter not of law, or against law, the duty imposed would be violated; and if such matter not of law, or contrary to law, tended to mislead the jury in the performance of their constitutional function, it would be error. But the constitution is the highest law, and whatever contravenes its provisions—be it in the acts of the general assembly, or of any other branch of the government—is null. So that no series of acts concurring to the same end, on the part of any, or, indeed, of all the branches of the government, can effect a constitutional modification even, of any right conferred by the constitution. Much less can such acts result in depriving the people of any right reserved to themselves in the bill of rights prefixed to their organic law.

I hold, with this Court, that it is a sound rule of interpretation, that constitutional provisions are to be construed strictly as against the powers they confer, and in favor of the natural liberty of the people, upon which all constitutions and governments may be regarded as restrictions. But the reason of the rule must form its limitation in practice. When that ceases the rule ceases. Here the reason for construing constitutions strictly is to favor natural liberty upon which they are restrictions. Hence, if there be any provision, or class of provisions in a constitution, asserting the sacredness of that liberty in any regard from the interference of the government which it creates, the reason of the rule does not apply to that. On the contrary, it demands an enlarged and liberal interpretation, and for the very same reason. Such an interpretation is conservative of the natural rights of man. If, therefore, there should be any doubt in regard to the meaning of the section of the constitution under discussion, it must be liberally construed; for it is a part of the reserved rights of the people, which they secure from invasion or impairment by any department, or all the departments, of the government. They have joined it with the rights of conscience; and the government can no more constitutionally impair it, than they can infringe the religious liberties of the people. Can a single circuit judge, by a word, overthrow the right of the jury, thus secured from invasion by the whole government? If he can, what is the use of a bill of rights? If he cannot, the charge given below—as not only not law, but contrary to ex-

press law—to the constitution—was erroneous. Its tendency was to deprive the appellant of a constitutional trial, by taking from his jury the questions of law involved in his case. It resulted in a verdict of guilty against the defendant. He has a right to attribute that verdict to this erroneous charge. He does so, and demands that the judgment based upon it be reversed.

2. It may, perhaps, be said that the right of the jury was sufficiently asserted by the Court, in the words, "and may determine the law;" but in their connection these words mean nothing. Indeed they mean something less than nothing. They seem only to have been introduced the better to enable the Court to give point and effect to what follows, namely: "but it is as much their duty to believe the law to be as the Court instructs them it is, as it is their sworn duty to determine the evidence." The meaning of this clause of the charge is unequivocal. But if not, why did the Court refuse to give the charge asked by the defendant? That was couched in these words: "By the constitution of *Indiana* the jury, 'in all criminal cases whatever,' are the judges, both of the law and the evidence." The denial of this charge fixes beyond all question the intention of Judge Hanna to take the question of law wholly from the jury; or, at least, only to give them the right to dissent from him in regard to it, on condition of their committing perjury.

3. The constitution of 1816 differed widely from the present constitution on this point. It provided for "a speedy public trial by an impartial jury;" "and in all indictments for libels, the jury shall have the right to determine the law and the facts, under the direction of the Court, as in other cases." Art. 1, §§ 10, 13. Yet under these provisions, and the beneficent common law, it was held error by this Court to deny a charge like the one asked in the case at bar, by the appellant. *Warren* v. *The State*, 4 Blackf. p. 150. By a stronger reason, it must be error under a constitution which declares that, "in all criminal cases whatever, the jury shall have the right to determine both the law and the facts."

4. I submit the following authorities as in point; for, although arising under constitutions less explicit than ours, yet they clearly indicate what would have been the rulings of the Courts by which they were rendered, upon it. *Patterson* v. *The State*, 2 Eng. (Ark.) 59.—*Sanford* v. *The State, id.* 328.—*Bell* v. *The State*, 5 *id.* 536.—*Holder* v. *The State*, 5 Georgia R. 441.—*Callender's Case, supra.*—*Frier's Case, supra.*—1 Chitty Cr. Law, *supra.*—*Townsend* v. *The State*, 2 Blackf. 151.

5. So far, then, as this argument stands upon constitutional grounds, its force is clear, from a comparison of art. 1, §§ 5, 10 and 13 of the constitution of 1816, with art. 1, §§ 19 and 20 of the present constitution. If the right which I claim for the jury "in all criminal cases whatever," may be abridged by the Courts, then the Court has a right to determine the law in prosecutions for libels, as well as in other cases. But who will contend for this exploded demand of an oppressive government?

6. I come at last to the favorite argument of those who deny the right of the jury to determine the law in criminal actions. It might appear to a modest man invidious to urge it; but it has been urged, and will no doubt be urged again, by those who may regard the authority of the jury as an unpleasant restriction of their own power over the lives and liberties of their fellow citizens. They say, that the criminal jury should not be permitted to exercise the right in question, because *they are ignorant of the law.*

Now, I think, a brief examination of this argument will put it down.

1st. If it were conceded that juries were entirely ignorant of the law, that ignorance cannot deprive them of a right conferred by the constitution. It is only a reflection upon their fitness for the exercise of that right. The same reflection might be extended to some of our Courts, with equal justice and propriety. It simply resolves itself into the question, have the people wisely bestowed the power in question upon the jury? Judge HANNA thinks not. I see proper to differ with him. At any rate, as the question for the Court is rather the fact of the bestowal of the power in question, than the wisdom thereof, I am content to confine myself to the fact. This case stands upon that—not upon its wisdom or folly.

2dly. But the jury are the people. If they have not capacity to determine the law, when the constitution gives them the right, and thereby imposes the duty, to do so, by what reason shall we be able to establish their capacity to elect judges capable of doing what they themselves are incompetent to perform? Surely, the wise choice of a judge is a more difficult function, than the determination of a simple question of law; for it demands a knowledge both of the duties of the judge, and his fitness to perform them—a knowledge of the law and of his proficiency therein, and a judgment upon the relation sustained by the man to the law.

3dly. All men are presumed to know the law. *Ignorantia legis neminem excusat.* Of course this knowledge must be held to extend to all the purposes of the law. The jury is a function of society, invested by the constitution with the right to determine both the law and the facts in all criminal cases whatever. To presume them ignorant of any matter relating to that function, is contrary to the maxim, and to the constitution. The Court has no right to indulge any such presumption. It can presume no man ignorant of the law.

4thly. But the ignorance of jurymen must be either a matter of fact, or a matter of law. As a matter of fact the same objection may with great force be urged against many of our judges. All reversals of judgments go to establish it. The argument would, then, lay the foundation for assailing the right of these Courts to determine any question of law, if their ignorance of the law be regarded as a mere matter of fact, and that fact, when established, as sufficient to oust them of jurisdiction. If, on the other hand, it is to be regarded as matter of law, then no man is presumed ignorant of the law.

5thly. The argument plainly assumes that there are two degrees of knowledge of the law, if taken in connection with the maxim—one of the people, the other of the legal *caste*. Now, if this distinction be conceded to exist in *Indiana*, where every voter of good moral character may become a member of the legal profession, still there lies in the distinction itself, the answer to the argument sought to be based upon it. The citizen, in the commission of any given crime, can only become guilty in fact and in conscience by virtue of the law as he is presumed to understand it. Should the jury be satisfied in any case, that the defendant was wholly ignorant of the existence of any law making his act criminal, or that his act was, in a moral point of view, wrong when done, it would undoubtedly be their duty to find him not guilty. Thus idiots, lunatics, monomaniacs, and the like, are entitled to acquittal, when it would be proper to convict others. If, then, the people are to be regarded as having one degree of knowledge, and the Courts another, I ask, against which shall a defendant in any criminal prosecution be taken to have offended?—the pop-

ular, or the professional? Certainly only that which he had, at the date of the offense. That is generally the popular. Where that is the case, then only against that has he sinned; for that only, brings guilt to his conscience. To judge him by a more exact knowledge, involves all the injustice of punishing an innocent man by a law which he knew not, and, upon our hypothesis, could not know. This would lead to a different rule in different cases; that every man may have justice according to the completeness and accuracy of his knowledge of the law. Justice demands this diversity. Where only can this just measure of justice be found? I answer, in the jury—the defendant's fellow-citizens—his country—his peers. They know the law as he knew it. They represent the popular ideal of the law, as it is written upon the hearts and consciences of the people—as the transgressor understood it when he transgressed. They are to him, therefore, the living law. It is meet and proper they should judge the law for him. It is not justice to apply the technical rule of the Courts. Justice demands the living rule of the people—that which sways, controls, makes guilty, or absolves the consciences of the masses. To that the offender must answer, by that stand or fall. It is no more than simple justice, that the warm, living, humanized law, as it is written in the popular heart, should be applied to each case by the defendant's neighbors and peers; for difference of education, origin and circumstances, tinge with different shades those acts which all recognize as criminal. I beg leave to introduce another non-professional authority at this point. I find my justification for doing so in the fact that mere lawyers have not always spoken best on questions affecting the liberty of the people—the rights of humanity.

"Society cannot but live in a state; the high destiny of man demands it; the state acts through laws; they are the great organs of human society, the organs of combined reason; without them men cannot live in society, or fulfill that for which they were created—and now, when the very moment ultimately arrives for which the law was made, when it is finally to be applied as a general rule to a practical and concrete case; when, in short, the abstract principle is to be realized in practical life, for weal or woe, for the protection of some, or the punishment of others, it is in a great measure left to the juror, to the citizen taken fresh from the people. The jurors, therefore, are justly called by the *British* law the country. There is a deep meaning in this expression, as it has grown in the course of centuries; for the jury truly and practically represent the country to the person that is to be tried. The law is the expression of the public will, and the jury represent the jural society, in judging whether, in the given case, the facts warrant the application of the law. The jury represent the country, not the government; they judge the facts according to rules and laws indeed, but also with the feeling of living men, and not merely as if they represented the abstract law, as it is written down. To represent this a learned judge would be sufficient. The jury represents, or rather is, whenever faithful, the living, operating law. Indeed, it may justly be said, that though but for a brief time, yet, for this brief time, a jury represents more fully and entirely human society as formed into a state, with its great objects, than any other person or body of men, even that of the monarch not excepted." Lieber's Pol. Eth., vol. 2, pp. 603, 604.

I have been thus led to conclude that both at common law, and by virtue of the constitution of *Indiana*, the jury, "in all criminal actions whatever, have the right to determine both the law and the facts;" and that this beneficent

authority is most favorably bestowed for the promotion of the ends of justice, and the liberty and security of the people. And, satisfied that such is the case —that I am sustained in this conclusion by the authority of law, and the necessity of reason—the growth of a principle resident in the nature and fitness of things—from which there is no escape, I feel neither regret nor mortification, that among the old lawyers this right of the jury was denied most earnestly by those judges who were the willing tools of royal oppression and cruelty, and among others by the infamous JEFFREYS, upon the trial of ALGERNON SIDNEY, whose death, though upon the scaffold and by the headsman's axe, became to him the gateway of an imperishable glory and renown, while his brutal judge descended from the judgment seat to an immortality of unmingled infamy and disgrace.