## PIERSON v. THE STATE.

1. When the bill of exceptions in a criminal case does not state evidence before the jury to warrant the particular instructions asked and refused, the legal presumption from the omission is, that there was no such evidence.

2. The common law of this State on the subject of *homicide*, is the same as the common law of England, and whenever that law requires the person assailed to decline the contest or to retreat, before he will be excused in taking the life of his adversary, our law requires the same.

3. The circumstance that the prisoner, after the killing, wipes the knife with which the fatal wound is inflicted, is not so controlling, or so insignificant, as to warrant the prisoner in calling for the charge that it is not evidence of murder, or to justify the court in instructing the jury that it was. It is a fact evincing coolness and self-possession, and as such, proper to be left to the jury in connexion with the other circumstances of the case, for them to determine whether the killing was with malice aforethought, or on sudden heat and passion.

4. It is not error for the court to refuse to instruct the jury, that they in capital cases are judges of the law as well as of the fact.

Writ of Error to the Circuit Court of Dallas, allowed in vacation by one of the Judges of the Supreme Court.

THE prisoner was indicted for the murder of one Rich, and tried and convicted at the spring term, 1846.

At the term when the indictment was found, that is, at the fall term, 1847, and before the grand jury had returned any bills of indictment, and in the absence of any evidence whatever, that the grand jury had acted on any criminal matter, the prisoner, by his counsel, stated that he was confined in jail, on a charge for the murder of one Rich, and that his case would likely be before the grand jury. He thereupon moved the court to have the grand jury brought into court and purged in reference to his guilt or innocence; and that each grand juror might be asked before they were sworn and organized, and at the time they were so sworn and organized, whether he had any fixed opinion as to the guilt or in-

nocence of the prisoner, which would bias his finding. The court overruled the motion, and the prisoner excepted.

At the trial, it was proved that in the course of the day the deceased and the son-in-law of the prisoner had a rencounter, not long after which, the prisoner approached the deceased, and urging his fist against the neck of the deceased, said he could break the neck of a damned Scotchman. The deceased was then drunk, but made no resistance. This occurred in a grog-shop, the keeper of which interposed, and prevented any further difficulty. Deceased shortly afterwards invited the prisoner to drink with him, and they drank together. The prisoner then lay down on a bench in the shop for two or three hours, apparently asleep. In the mean time, the deceased was sitting on the steps of another grog-shop, under intoxication, muttering something with occasional oaths. The prisoner was first observed peeping round the corner of the house, and approaching, said, " damn you some too." The deceased rose staggering, and said, "uncle Reub, you must not talk so"—and went towards the prisoner, who drew his knife. Some one interfering, the prisoner said, "let him come on, and I will kill him"—or some such expressions. The deceased had nothing in his hands. A person interposed and said to the prisoner, it was a shame to draw a knife on a drunken man. The matter was suspended for a few minutes, and the other persons present started away. Without knowing exactly who approached the other, the prisoner and the deceased were shortly seen in contact, the prisoner having the accused by the collar, when the latter struck the prisoner twice with his open hand, in or about the face ; when the prisoner made an ineffectual blow with his knife. On the deceased repeating the slap, (so called by the witness), the accused made another blow with his knife, which struck the deceased about the breast, and caused almost instant death. The proof showed the deceased to have been an inoffensive man, drunk or sober. The knife was an ordinary pocket knife, the larger blade sharp-pointed. The whole transaction, the last meeting and rencounter lasted a very short time—say four or five minutes. Rich was thirty or thirty-five years of age—the prisoner an old man—they had always before been very friendly, and had

drank together two or three times after the meeting in the morning, and before the prisoner lay down on the bench.

After the evidence was concluded, and a general charge by the court upon the common law rule upon the subject of self-defence, and as to what that required to be shown to en-title or avail the prisoner to that defence, the prisoner, by his counsel, asked the court to charge the jury—

1. That the prisoner, after he had been slapped three times in the face by Rich, was not bound to retreat before he killed him.

2. That no man in this country is bound, according to the English common law, to retreat before he kills.

3. That the prisoner's wiping his knife, after he had kill-ed Rich, is not evidence that he committed murder.

These were all refused by the court.

4. That the jury are judges of the law, as well as the facts.

This was refused in the language asked for, but the court charged the jury they had the right to render a general verdict, and thereby adjudge the law and the facts, and the judge was thus precluded from granting a new trial on the belief the jury had mistaken either, that their verdict was final as to both law and fact.

The prisoner excepted to the several refusals to charge as requested, and to the charge as given; and now assigns the several rulings of the court as error.

LODOR, for the prisoner, made the following points:

1. The refusal of the court below to charge the jury, that the prisoner, after he had been slapped three times by Rich, was not bound to retreat before he killed him.

2. The refusal of the court below to charge the jury, that no man, in this country, is bound, according to the English common law, *to retreat* before he kills another. [The State v. Caywood, et al., 2 Stew. 360.]

3. The refusal of the court below to charge the jury, that the prisoner's wiping his knife after he had killed Rich, was not evidence that he had committed murder.

4. The refusal of the court below to charge the jury, that the jury are judges of the law as well as the facts, in the lan-

guage asked for. [The State v. Jones, 5 Ala. 666; 4 Black.
Com. 361; People v. Crosswell, 3 Johns. Cases, 287; Commonwealth v. Knapp, 10 Pick. Rep. 477; The State v.
Snow, et al. 18 Maine R. 346.]

5. The charge as given by the court below, "that the jury had a right to render a general verdict, and thereby adjudge both the law and the facts, and the judge was thus
precluded from granting a new trial, on the belief that the jury may have mistaken either, that their verdict was final as
to both law and fact." [State v. Slack, 6 Ala. 676; U. S.
v. Fries, 3 Dal. R. 515; Commonwealth v. Green, 17 Mass.
515; The People v. McKay, 18 John. 212.]

6. The matters of the first and second bills of exceptions.
[The State v. Hughes, 1 Ala. 655; People v. Jewett, 3 Wendell, 314; Commonwealth v. Smith, 9 Mass. 107.]

ATTORNEY GENERAL, contra.

GOLDTHWAITE, J.—1. The three first of the charges
which the circuit judge refused to give at the instance of the
prisoner, do not seem to have been called for by any evidence before the jury. It will be seen by reference to the
bill of exceptions, there was no proof of any assault by the
prisoner, which *justified* or *excused* him (in the legal sense of
these terms) in taking life in self defence, and we must presume the proper instructions were given as to the effect which
the conduct of the deceased might have had upon the question of malice and heat of blood. So too, it will be seen,
there is nothing from which this court can ascertain that the
prisoner, in point of fact, did or did not wipe his knife deliberately, or otherwise, after the fatal blow. It may be, that
all these charges were refused on the ground, that no proof
was before the jury to warrant their being asked. And such
in our judgment is the legal presumption arising out of the
omission to state the circumstances of proof, from which the
right to instructions might appear.

2. Lest, however, it should be supposed our opinion was,
that under peculiar circumstances it might be the prisoner's
right to require such charges, we shall briefly state the law
as we understand it. The common law of this State on the

subject of homicide, is derived from, and the same as, the common law of England, and whenever that law requires the person assailed to decline the combat, or to retreat, before he will be excused in taking the life of his adversary, our law requires the same. There is nothing in our institutions which has abrogated the rule, that no one is excused from shedding his brother's blood, unless the assault upon him is such as to produce a well-grounded apprehension of iminent danger to life or limb.

3. The refusal to charge, that the wiping by the prisoner of his knife, after the killing, was not evidence that he committed murder, is not, as we have before said, called for by the proof, but if it was, we think was not so controlling, or so insignificant a circumstance as to warrant the prisoner in calling for the charge, that it was not evidence of murder, or to justify the court in instructing the jury it was. Doubtless it was a fact evincing coolness, and self possession, and as such properly left to the jury, in connection with the other circumstances for them to determine, whether the killing was done with malice aforethought, or upon sudden passion, induced by the assault, and slapping in the face, or other heat of blood, lessening the crime to manslaughter.

4. Upon the question, whether, according to the course of the common law, juries in this State are judges of the law as well as the fact, we consider it as substantially settled by what is said by us in The State v. Jones, 5 Ala. 666. There the point was, whether the jury was properly sworn, to give a true verdict according to the evidence—the prisoner insisting the oath should be, to find a verdict according to *law* and evidence. We there considered the court as the proper tribunal to expound the law to the jury, and that the latter had no other control over questions of law than that arising out of the right to return a general verdict of not guilty. We consider what is there said as a proper exposition of the law. The slightest examination will convince every one, that if the jury, and not the court, are the proper expounders of the law, there could properly be no revision of a verdict on this ground, either by the judge trying the cause, by awarding a new trial, or by an appellate court upon the ground of misdi-

20

rection. If the jury are the judges of what is, and what is not law, why call on us as a court of errors, to revise the action of the circuit court upon a point of law. We cannot better state our opinion upon this question, than by quoting the opinion of one of our soundest jurists. " The jury, says Judge Story, are no more judges of the law in a capital, or otherwise criminal offence, upon the plea of not guilty, than they are in every civil case tried on the general issue. In each of these cases their verdict, when general, is necessarily compounded of law and of fact, and includes both. In each case they must necessarily determine the law, as well as the fact. In each case they have the physical power to disregard the law as laid down by the court. But I deny that in any case, civil or criminal, they have the moral right to decide the law according to their own notions or pleasure. On the contrary, I hold it the most sacred constitutional right of every party accused of a crime, that the jury should respond as to the facts, and the court as to the law. This is the right of every citizen, and it is his only protection. If the jury were at liberty to settle the law for themselves, the effect would be, not only that the law itself would be most uncertain, from the different views which different juries might take of it, but in case of error there would be no remedy or redress by the injured party, for the court would have no right to review the law as it had been settled by the jury." [U. States v. Battiste, 2 Sumner, 240.]

We are too apt, in speculating on a subject like this, to consider, that courts will always be prone to settle the law rigidly against crime, or that juries must always lean towards a lax construction of criminal law, without reflecting that prejudice and passion may sometimes operate with fearful violence in the jury box against the particular individual. Our law has wisely provided therfore for the protection of all just rights, that the courts shall expound it, whilst on the other hand, by confiding to juries the power of returning a general verdict, it is rendered almost impossible the citizen can ever be injured by the tyranny or oppression of the judge. Beyond this, even in providing for a revision of the cause, upon exceptions tendered, and by writ of error, the legislature has placed its citizens in security from the mistakes which

possibly may occur in the rulings of the judge at the trial. We are satisfied the law was correctly expounded by the circuit judge.

With respect to the motion of the prisoner to examine individual grand jurors, as to their opinions of his guilt, or innocency, before swearing them on the panel, the decision in Clarissa v. The State, 11 Ala. R. 57, is conclusive that it was properly refused.

Having now examined all the points raised in this court against the proceeding in the court below, we have only to add our judgment, that there is no error in the record.

Affirmed.