State *v.* Wright.

---

### STATE *versus* JESSE WRIGHT.

The jury are not judges of the law in criminal prosecutions.

By R. S., c. 106, § 3, "all officers of the United States, and coroners," among others, "shall be exempted from serving as jurors, and their names shall not be placed on the lists."

Exemption is not disqualification, but a personal privilege of the person exempted which he may waive; and, if he does so, parties have no ground of complaint.

Hence, an indictment will not be quashed because one of the grand jurors finding it was a postmaster.

Nor will judgment be arrested because one of the traverse jurors was a coroner.

State *v.* Wright.

When, after examination, no cause of challenge appearing, a juror is peremptorily challenged and discharged, the prisoner has no legal right to recall him and have him sworn.

The statute does not require the name of a talesman to be in the jury box.

When all the counts in an indictment substantially set out the same offence, differing only in the description of the means used to commit it, a general verdict is all that the law requires.

The defendant was indicted, tried and convicted of murder in the first degree, at the October term, 1863, WALTON, J., presiding.

The case came before this Court on exceptions which appear in the opinion.

*Webster & Whitcomb,* for the defendant.

*Peters, Attorney General, contra.*

WALTON, J. — The most important question raised by the bill of exceptions in this case is whether, in the trial of criminal cases, the jury may rightfully disregard the instructions of the Court, in matters of law, and, if they think the instructions wrong, convict or acquit contrary to such instructions. In other words, whether they are the ultimate, rightful and paramount judges of the law as well as the facts.

Our conclusion is that such a doctrine cannot be maintained; that it is contrary to the fundamental maxims of the common law; contrary to the uniform practice of the highest courts of judicature in Great Britain, where our jury system originated and matured; contrary to a vast preponderance of judicial authority in this country; contrary to the spirit and meaning of the constitution of the United States and of this State; contrary to a fair interpretation of our legislative enactment, authorizing the reservation of questions of law for the decision of the law court, and the allowance of exceptions; contrary to reason and fitness, in withdrawing the interpretation of the laws from those who make it the business and the study of their

lives to understand them, and committing it to a class of men who, being drawn from non-professional life for occasional and temporary service only, possess no such qualifications, and whose decisions would be certain to be conflicting in all doubtful cases, and would therefore lead to endless confusion and perpetual uncertainty.

1. *It is contrary to the fundamental maxims of the common law.* It was very early provided that the jury should not entangle themselves with questions of law, but confine themselves simply and exclusively to facts. This rule is expressed in the well known maxim, *ad questionem facti non respondent judices, ad questionem legis non respondent juratores.* —It is the office of the judge to instruct the jury in points of law—of the jury to decide on matter of fact." Broom's Legal Maxims, 77. "An invaluable principle of jurisprudence," says Mr. Forsyth, in his History of Trial by Jury, "which, more than anything else, has upheld the character and maintained the efficiency of English juries, as tribunals for judicial investigation of truth." The author says it is impossible to uphold the doctrine that the jury are in any case to give a verdict according to their own view of the law; that it is founded on a confusion between the ideas of *power* and *right.* "The law," continues he, "cannot depend on the verdict of a jury, whose office is simply to find the truth of disputed facts; and yet such must be the result if they may decide contrary to what the judge, the authorized expounder of the law, lays down for their guidance. This would introduce the most miserable uncertainty as to our rights and liberties, the *misera servitus* of *vagum jus,* and be the most fatal blow that could be struck at the existence of trial by jury." Forsyth's History of Trial by Jury, 259, 265.

2. *It is contrary to the uniform practice of the highest Courts of judicature in England.* Mr. Forsyth, after assigning as a reason for the unpopularity and final disuse of juries in Scandinavia and Germany, that they carried in

State *v.* Wright.

their very constitution the element of their own destruction, in this, that the whole judicial power,—the right to determine the law as well as the fact,—was in their hands, says: "Far otherwise has been the case in England. Here the jury never usurped the functions of the judge. They were originally called in to aid the court with information upon questions of fact, in order that the law might be properly applied; and this has continued to be their province to the present day. * * * Hence it is that the English jury flourishes still in all its pristine vigor, while what are improperly called the old juries of the continent have either sunk into decay or been totally abolished." Trial by Jury, 11, 12.

Parties have often endeavored to appeal from the court to the jury in matters of law, especially in state prosecutions for treason and libel; but it is believed that no English case can be found in which such an appeal has been sanctioned by the court.

In 1649 one Col. Lilburne was tried for treason. He was very contumacious, and at one time claimed the right to read some law to the jury. This the Court would not allow. He flew into a passion and told the judges that they were "no more but Norman intruders, and indeed and in truth, if the jury please, no more but cyphers to pronounce their verdict." One of the judges, (JERMIN,) in language more emphatic than elegant, pronounced the doctrine a " damnable blasphemous heresy;" and the jury were instructed by the Chief Justice that they were not the judges of the law; that they "ought to take notice of it, that the judges, who are twelve in number, and who are sworn, have ever been the judges of the law, from the first time we can read or hear that the law was truly expressed in England, and the jury only judges of matter of fact." 2 Hard. State Trials, 69, 82.

In 1734, a criminal information in the nature of a *quo warranto*, to try the validity of an election to a corporate office, had been submitted to a jury, and a motion was made

to have the verdict set aside as against law.   Lord HARD-WICKE said:—"The thing that governs greatly in this deter-mination is that points of law are not to be determined by juries; juries have a power by law to determine matters of fact only; and it is of the greatest consequence to the law of England, and to the subject, that these powers of the judge and jury are kept distinct; that the judge deter-mines the law and the jury the fact; and if they ever come to be confounded it will prove the confusion and destruc-tion of the law of England."   *King* v. *Poole*, Hard., 28.

In 1784 the Dean of St. Asaph was indicted for a libel. Lord ERSKINE defended him and insisted that the jury had a right to pass upon the whole issue, including the law as well as the fact.   Being overruled by Mr. Justice BULLER, he moved for a new trial for misdirection; and in support of his motion is said to have made one of the most capti-vating arguments ever listened to in Westminster Hall. But he did not succeed.   The judges were unanimously against him.

Lord MANSFIELD, in delivering judgment, declared that in matters of law the judge ought to direct the jury, and the jury ought to follow the direction; that this practice ought not to be shaken by general theoretical arguments or popular declamation; that the jury do not know and are not presumed to know the law; that they do not understand the language in which it is conceived, or the meaning of the terms in which it is expressed; and have no rule to go by but their passions and feelings; that if they should happen to be right it would be by chance only; that to be free is to live under a government of law; that if the law is to be in every case what twelve men who shall happen to be the jury shall be inclined to think, liable to no review, subject to no control, under all the popular prejudices of the day, no man could tell, no counsel could advise, what the result would be; that such a doctrine was contrary to judicial practice, contrary to the fundamental principles constituting trials by jury, contrary to reason and fitness, and he was glad that he

State *v.* Wright.

was not bound to subscribe to such an absurdity. 3 T. R., 428, note.

3. *It is contrary to a vast preponderance of judicial authority in this country.* Before the revolution the doctrine seems to have met with some favor. It was undoubtedly believed that in the then condition of things it would be safer for the colonies that the power of determining the law should be vested in the jury than to leave it in the hands of the judges. And even after the revolution the doctrine seems to have obtained some currency that in all cases, civil as well as criminal, the jury had a right to determine the law as well as the facts. In a case tried in the Supreme Court of the United States, in 1794, the full Court instructed the jury that they had a right " to determine the law as well as the fact in controversy." This was in a civil suit. *Georgia* v. *Brailsford*, 3 Dall., 4.

But this mode of administering justice could not continue. The federal courts soon discovered that however useful such a doctrine might have been to us as colonies, it was wholly incompatible with our new and improved system of government under the federal constitution. It was seen that to concede such a power to the jury would deprive the Judges of the Supreme Court of that supremacy in matters of law which the constitution had wisely conferred upon them.

In a case before Mr. Justice BALDWIN, of the Supreme Court of the United States, a man by the name of Shive was tried for counterfeiting notes of the United States Bank. His counsel gravely argued to the jury that they ought to acquit his client on the ground that the act chartering the bank was unconstitutional and void, and that to counterfeit the bills of such an institution was no crime. True, he said, the Supreme Court of the United States had decided otherwise, and, as it was composed of very respectable gentlemen, he would not deny that their opinion was entitled to some consideration; but he contended that, nevertheless, it was the right and the duty of the jury to revise the decis-

ion, and if in their judgment it was wrong to disregard it.

Judge BALDWIN at once saw the absurdity of such a doctrine. "Should you assume and exercise this power," said he, in his charge to the jury, "your opinion does not become a supreme law; no one is bound by it; other juries will decide for themselves, and you could not expect that courts would look to your verdict for the construction of the constitution as to the acts of the legislative or judicial departments of the government; nor that you have the power of declaring what the law is, what acts are criminal, what are innocent, as a rule of action for your fellow citizens or the Court. If juries once exercise this power we are without a constitution or laws. One jury has the same power as another. You cannot bind those who may take your places. What you declare constitutional to-day another may declare unconstitutional to-morrow. We shall cease to have a government of law, when what is the law depends on the arbitrary and fluctuating opinions of judges and jurors, instead of the standard of the constitution, expounded by the tribunal to which has been referred all cases arising under the constitution, laws and treaties of the United States." *United States* v. *Shive*, 1 Bald., 512.

In *United States* v. *Battiste*, 2 Sum., 243, Judge STORY charged the jury that it was their duty to follow the law as it was laid down by the Court. "I deny," said he, "that in any case, civil or criminal, they have the moral right to decide the law according to their own notions or pleasure. On the contrary, I hold it a most sacred constitutional right of every party accused of a crime that the jury should respond as to the facts, and the Court as to the law. It is the duty of the Court to instruct the jury as to the law, and it is the duty of the jury to follow the law as it is laid down by the Court."

So in *United States* v. *Morris*, 1 Curtis' C. C. R., 53, Mr. Justice CURTIS placed his ruling on the same high constitutional ground. "My firm conviction is," said he, "that, un-

der the constitution of the United States, juries in criminal cases have not the right to decide any question of law; and that, if they render a general verdict, their duty and their oath require them to apply to the facts, as they may find them, the law given them by the Court."

In *Stettinus* v. *United States*, 5 Cranch's C. C. R., 573, Chief Justice CRANCH, in a very full, able and instructive opinion, held that neither at common law, nor under the constitution of the United States, had the jury any right to judge of the law. This was in the Circuit Court of the United States for the District of Columbia.

In a criminal case tried in the Circuit Court of the United States, in the city of New York, Mr. Justice THOMPSON, when requested to charge the jury that they were judges of the law as well as the facts, briefly, but not ambiguously, answered: "I shant: they aint." 2 Whar. Criminal Law, § 3100.

In *Pierce* v. *The State*, 13 N. H., 536, the indictment charged a violation of the Act regulating the sale of wines and spirituous liquors. The defendant's counsel contended that the jury were the judges of the law as well as the facts in the case; that it was their duty to judge of the constitutiorality of the Act, and to form their own opinion upon that question, and that the Court had no right to *instruct* them in relation to questions of law, — it could only *advise* them. The Court held that the jury were not judges of the law in criminal cases. "We cannot believe," said the Court, "that impartial and reflecting men, of whatever profession they may be, can advocate doctrines which may lead to such results as the right of the jury to decide the law may end in. * * * No reflecting man in the jury box would be willing to take upon himself this responsibility. * * * And it is the opinion of the Court, that it is inconsistent with the spirit of the constitution that questions of law, and still less questions of constitutional law, should be decided by the verdict of the jury, contrary to the instructions of the Court."

State *v.* Wright.

In *Commonwealth* v. *Porter*, 10 Met., 263, the defendant's counsel contended that the jury had a right to disregard and overrule the decision of the Court, as to whether one of the sections of a prior statute was, by implication, repealed by a subsequent statute. The right of the jury to determine questions of law was fully considered, and the Court held that it is the duty of the jury to receive the law from the Court, and to conform their decision thereto; that to this duty jurors are bound by a strong, social and moral obligation, enforced by the sanction of an oath.

In *Carpenter* v. *People*, 8 Barb., 610, the Supreme Court of New York said: — "The idea, which has become somewhat current in some places, that in criminal cases the jury are the judges of the law as well as the facts, is erroneous, not being founded upon principle or supported by authority." And again, in 1863, in *Duffy* v. *People*, 26 N. Y., 588, the New York Court of Appeals unanimously held that "the jury in criminal cases are bound by the instructions of the Court as to the law to the same extent as in civil cases."

The question seems never to have been directly before the Supreme Court of the United States sitting *in banc*; but several of the Judges of that Court, namely, — BALDWIN, THOMPSON, STORY and CURTIS, as we have already seen, have emphatically denied the right of the jury to decide the law in any case, civil or criminal; and we cannot doubt that such will be the decision of the full Court if the question ever comes before them.

The following States unite in the doctrine that it is the duty of the jury to be governed by the law as it is laid down by the Court: New Hampshire, in *Pierce* v. *State*, 13 N. H., 536; Massachusetts, in *Com.* v. *Porter*, 10 Met., 263; *Com.* v. *Anthers*, 5 Gray, 185; Rhode Island, in *Dorr's Trial*, 121; New York, in *People* v. *Pine*, 2 Barb., 566; *Carpenter* v. *People*, 8 Barb., 610; *Safford* v. *People*, 1 Parker, 474; *Duffy* v. *People*, 26 N. Y., (Smith,) 588; Pennsylvania, in *Penn.* v. *Ball*, Addison, 860; 2

Whart. Cr. Law, § 3106; Virginia, in *Davenport* v. *Com.*, 1 Leigh, 588; *Com.* v. *Garth*, 3 Leigh, 761; *Howel* v. *Com.*, 5 Grat., 664; North Carolina, in *State* v. *Pearce*, 2 Jones, (Law,) 251; Ohio, in *Montgomery* v. *State*, 11 Ohio, 424; *Robbins* v. *State*, 8 Ohio St. R. (N. S.,) 131; Kentucky, in *Montee* v. *Com.*, 3 J. J. Marsh., 150; *Com.* v. *Van Tuyle*, 1 Met., (Ky.,) 1; Alabama, in *Pierson* v. *State*, 12 Ala., 153; *Batse* v. *State*, 18 Ala., 119; Missouri, in *Hardy* v. *State*, 7 Mo., 607; Mississippi, in *Williams* v. *State*, 32 Miss., (3 George,) 389; Arkansas, in *Pleasant* v. *State*, 8 Eng., (13 Ark.,) 360; Texas, in *Nels* v. *State*, 2 Texas, 280; Tennessee, in *McGowan* v. *State*, 9 Yerger, 184.

In Indiana the decisions are influenced by local legislation, and are therefore unimportant. There are, however, two well considered decisions in that State in which the right of the jury to determine the law is denied. (2 Black, 156; 2 Carter, 617.) *Contra*, 4 Black, 150, 247; 10 Ind., 503.

*State* v. *Holden*, 5 Geo., 441, and some other cases in that State, (Georgia,) have been supposed by some to be in favor of the doctrine. But this is an error. In that State the subject is regulated by express statutory law, and their decisions have no bearing upon the question as a common law right.

In Vermont, in *State* v. *Croteau*, 23 Vt., 14, a majority of the Court held that, in criminal cases, the jury are judges of the law as well as the facts, but the doctrine was resisted in a very able dissenting opinion by Judge BENNETT; and, in a later case, (*State* v. *McDonnell*, 32 Vt., 523,) the presiding Judge declared to the jury that to him such a doctrine was " most absurd and nonsensical," and the full Court held the remark unexceptionable.

In Maine, in *State* v. *Snow*, 18 Maine, 346, the Court seems to have taken it for granted that the law was settled in favor of the right of the jury to determine the law in criminal cases, and gave the question apparently very little

consideration. Two cases only are cited. One of them (*Croswell's case*, 3 Johns. Cases, 337,) establishes no such doctrine; and the other, (*Com.* v. *Knapp*, 10 Pick., 497,) has been emphatically overruled by the same Court which made the decision.

4. *It is unconstitutional.* The constitution of the United States confers upon the Judges of the Supreme Court the power to adjudicate and finally determine all questions of law properly brought before them. · To allow juries to revise, and, if they think proper, overrule these adjudications, · would deprive them of their final and authoritative character, and thus destroy the constitutional functions of the Court.

The Supreme Court of the United States and of this State have decided that prohibitory liquor laws, like the one now in force in this State, are constitutional. Is it within the legitimate power of each successive jury impannelled to try a liquor case, to reconsider that question, and, if they think proper, overrule those decisions? Is each successive jury impannelled to try a person charged with counterfeiting our national currency, to be told that they may rightfully disregard the decisions of the Supreme Court of the United States and the rulings of the presiding Judge, if they, in the exercise of their own judgment, think them wrong, and acquit the defendant upon the ground that the Act of Congress authorizing our national banks is unconstitutional? Every intelligent mind must perceive that it is impossible to maintain such a doctrine.

Law should be certain. It is the rule by which we are to govern our conduct. To enable us to do so we must know what the law is. Doubtful points ought therefore to be settled, not for the purpose of a single trial only, but finally and definitively. If each successive jury may decide the law for itself, how will doubtful points ever become settled? They will be bound by no precedents. They may not only disregard the instructions of the presiding Judge, and the verdicts of all former juries, but they may

also disregard the decisions of the law court. They will be authorized to construe statutes, declare the meaning of technical terms, and pass upon the constitutionality of legislative and congressional enactments, and acquit or convict according to their own view of the law. In doubtful cases — cases where authoritative expositions of the law are most needed — we should undoubtedly have conflicting verdicts, and the law would remain in perpetual uncertainty.

Difficult and important questions of law arise in criminal as well as civil suits. There is scarcely an Act of Congress, or of our State Legislature, the construction, interpretation or validity of which may not be brought in question in a criminal prosecution. Technical terms are to be explained, conflicting provisions reconciled, their prospective or retrospective operation ascertained, their effect to repeal or restore former statutes considered, and their constitutionality determined. To do this often requires much time, careful thought, the examination of numerous authorities, and a familiarity with the law as a science which a lifetime of preparatory study is scarcely sufficient to supply.

Juries are generally composed of upright men, willing and anxious to discharge their duty to the best of their ability. But they are drawn from non-professional life, and lack the advantage of a legal education. When a cause is finally committed to them they are put under duress of an officer, and are not allowed to separate till their consideration of the case is closed. They are not allowed the use of books, not even the statutes which they may be required to construe. Twelve men thus situated may be admirably qualified to weigh evidence and determine facts, and may be justly entitled to all the encomiums passed upon them in that respect; but it is impossible to believe they constitute a suitable tribunal for the determination of important and intricate questions of law.

" The founders of our constitution," said Chief Justice SHAW, (5 Gray, 235,) " understood, what every reflecting man must understand, from the nature of the law, in its

fundamental principles, and in its comprehensive details, that it is a science, requiring a long course of preparatory training, of profound study and active practice, to be expected of no one who has not dedicated his life to its pursuit; they well understood that no safe system of jurisprudence could be established, that no judiciary department of government could be constituted without bringing into its service jurists thus trained and qualified.   The judiciary department was intended to be permanent and co-extensive with the other departments of government, and, as far as practicable, independent of them; and therefore it is not competent for the Legislature to take the power of deciding the law from this judiciary department, and vest it in other bodies of men, juries, occasionally and temporarily called to attend courts, for the performance of very important duties indeed, but duties very different from those of judges, and requiring different qualifications."

We have already seen that many other eminent jurists, and among them Chief Justice PARKER of the Supreme Court of New Hampshire, and Justices BALDWIN, STORY and CURTIS of the Supreme Court of the United States, take the same view of this question; namely, that where, as in this State, the fundamental law vests the judicial power in the courts, it is unconstitutional to take from the judges the power to determine the law, and vest it in juries.    "Jurors," says Chief Justice SHAW, (5 Gray, 235,) "though they have important duties to perform in courts of justice, yet do not compose an essential element of the judicial department; their duties are limited and temporary, and the necessity of the attendance of juries and a trial by them is distinctly provided for by the constitution, and their function in such trial was well understood to be the finding of facts upon evidence, under the direction of the Court."

*Origin of the doctrine.*   The doctrine that the jury are judges of the law in criminal cases originated in a controversy in relation to the law of libel.   The doctrine of implied malice, which, when applied to homicides, has been

State *v.* Wright.

resisted by some of the best judicial minds in this country and in England, was exceedingly distasteful to the defendants, when applied to libels. The Judges, (in England,) formerly held that the character of the publication, — that is, whether it was or was not libellous, was to be determined by the Court; and, if the Court declared it to be libellous, then malice was implied and need not be proved; and, what was still more objectionable, the Judges were in the habit of directing the jury to return a verdict of guilty upon proof of publication and the truth of the *innuendos*, without telling the jury whether the paper was or was not a libel, and without permitting the jury to determine that question for themselves; and then putting the defendant to the trouble and expense of moving in arrest of judgment, or suing out a writ of error, if he thought the publication innocent. Thus, in the trial of the Dean of St. Asaph, for publishing a very harmless pamphlet, entitled a dialogue between a gentleman and a farmer, written by Sir William Jones, Mr. Justice BULLER told the jury that it was no part of their duty to form any opinion as to the character of the pamphlet, or the motives of the defendant in publishing it, and did not himself express any opinion upon these points; and, after long and vexatious litigation, judgment was finally arrested, because not a single sentence in the whole pamphlet could be pointed out that was libellous. If the Judge had told the jury that the pamphlet was not libellous, or had allowed them to determine that question for themselves, or had allowed them to pass upon the question of malice, the defendant would have been acquitted at the trial. This manner of trying libel suits led to a controversy in relation to the law of libel, which lasted for more than half a century in England; and finally resulted in an Act of Parliament, known in history as " Fox's Libel Act," declaring the right of the jury to pass upon the whole issue, and the duty of the Court to give their opinion and direction to the jury, as in other criminal cases. But this Act has never been construed in England as giving the jury the right to

determine the law, even in libel suits. "The judge is the judge of the law in libel as in all other cases," said the Court in *Rex* v. *Burdett*, 4 Barn. & Ald., 131. It was passed to correct the practice of requiring the jury to return a general verdict of guilty without the sanction of the judge's opinion that it was one warranted by law.

In the course of this controversy the argument was invented and urged with great plausibility by Lord Erskine, that, in all cases tried under the general issue, the jury had a right to determine the law as well as the facts. But this doctrine never met with favor in England. The principal ground relied upon was, not that the jury were judges of the law, but that the malicious intent with which a libel is always charged to have been made, is a question of fact and not a question of law; and the judges were charged with invading the province of the jury, not in withholding from them the decision of questions of law, but in withholding from them the decision of a question of *fact; and* it was upon this ground that the advocates of the right of the jury to pass upon the whole issue in libel suits, and to have the opinion of the Court whether the facts, if proved, would or would not warrant a verdict of guilty, finally triumphed.

In this country the right of the jury to pass upon the whole issue in prosecutions for libel is universally admitted. In this and many other States it is secured by constitutional provisions. In many of the constitutions it is provided that the jury may do this "under the direction of the Court," or "after having received the direction of the Court." The latter is the form of expression in this State. Upon these and similar provisions the question has been frequently raised, whether the jury are bound to follow the directions of the Court in matters of law, or are at liberty to disregard them, and determine the law for themselves. "Upon this point," says Mr. Greenleaf, "the decisions are not entirely uniform; and some of them are not perfectly clear from the want of discriminating between the *power* possess-

ed by the jury to find a general verdict, contrary to the direction of the Court in a matter of law, without being accountable for so doing, and their *right* so to do, without a violation of their oath and duty. But the weight of opinion is vastly against the right of the jury in any case, to disregard the law as stated to them by the Court; and, on the contrary, is in favor of their duty to be governed by such rules as the Court may declare to be the law of the land; the meaning of the constitutional provisions being merely this, that the jury are the sole judges of all the facts involved in the issue, and of the application of the law to the particular case." 3 Greenl., Ev., § 179.

We thus see that the doctrine that the jury are judges of the law as well as the facts in criminal cases, is contrary to the fundamental principles of the common law, contrary to a vast preponderance of judicial authority, contrary to reason and fitness; and, if allowed to prevail, will destroy the constitutional functions of the judicial department of the government. Whether under the provisions of our State constitution they may do so in prosecutions for libel, we express no opinion; but in all other criminal prosecutions we have no hesitation in saying it is the duty of the jury to be governed by the law as it is laid down by the Court. We fully concur in the opinion expressed by Chief Justice SHAW, (5 Gray, 198,) that, "the true glory and excellence of trial by jury is this: that the power of deciding fact and law is wisely divided; that the authority to decide questions of law is placed in a body well qualified, by a suitable course of training, to decide all questions of law; and another body, well qualified for the duty, is charged with deciding all questions of fact, definitively; and whilst each, within its own sphere, performs the duty entrusted to it, such a trial affords the best possible security for a safe administration of justice and the security of public and private rights."

Several other questions remain to be considered.

1. Exception is taken to the refusal of the presiding Judge

to allow the prisoner to retract his plea of not guilty, and plead in abatement that one of the grand jurors, by whom the indictment was found, was disqualified to act, being a postmaster of the United States; and to the refusal of the Court to quash the indictment for the same cause. All officers of the United States (which of course includes postmasters) are exempted from serving on juries. R. S., c. 106, § 3. But to *exempt* is not to *disqualify*. Exemption is the personal privilege of the party exempted, with which no one else has any concern. A postmaster of the United States is not, therefore, disqualified to act as a grand juror. He may waive his privilege; and if he does so, the parties to the suit have no ground of complaint. *State* v. *Fellows*, 5 Greenl., 333; *State* v. *Forshner*, 43 N. H., 89.

2. While the jury was being impannelled to try the prisoner, Warren Leland was called and examined, and, no cause of challenge appearing, the prisoner challenged him peremptorily, and he was discharged from any further attendance. The impannelling of the jury then proceeded for some time, when the prisoner moved to have Leland recalled and placed upon the pannel. This, the presiding Judge declined to do; and to this exception is taken. The exception cannot be maintained. Leland had been discharged from further attendance. Whether he was still present in Court does not appear. If he was, he was there as a spectator only, and the prisoner had no more right to have him recalled and put upon the jury, than if he had never been returned as a juror.

3. After one of the jurors had been sworn and taken his seat upon the pannel, the attention of the Court was called to the fact that he was a coroner. The juror did not claim to be excused, and the prisoner, under the advice of his counsel, expressly waived all objection to his sitting, and the attorney general did the same. It is now urged in arrest of judgment that the juror was incompetent, and that his being upon the pannel vitiates and renders the verdict invalid. The juror was not incompetent. Coroners, though

*exempted* from serving on juries, are not, as we have already seen, for that cause rendered incompetent to serve, if they will. It is therefore unnecessary to say anything about the effect of the waiver, for there was no valid objection to waive.

4. One of the jurors returned as a talesman from among the bystanders was objected to, because it did not appear that his name was in the jury box of the town where he resided; and *Com.* v. *Knapp*, 10 Pick. 477, is relied upon in support of the objection. The ruling in the case referred to was based on a statute then in force in Massachusetts requiring the names of those returned as talesmen to be in the jury box. There was such a statute in this State prior to 1841; but in the revision of that year it was omitted, and has not since been reënacted. At the time of the trial in this case, the law did not require the name of a person returned as a talesman from among the bystanders, to be in the jury box, and the objection was properly overruled.

5. Another ground relied upon in arrest of judgment is that the jury returned a general verdict, instead of a separate verdict, on each count in the indictment. When, as in this case, all the counts are substantially for the same offence, and differ only in the description of the means used to accomplish it, a general verdict is all that the law requires. 1 Whar. Cr. Law, §§ 421–425, and authorities there cited.

6. The prisoner's counsel contended that the jury were judges of the law as well as the facts; but the Court instructed them that it was their duty to take the law from the Court; that it would be a violation of their duty to reject the law as given them by the Court and return a verdict contrary thereto. To this the prisoner excepted. This point we have already considered. Our conclusion is that the instruction was correct.

*Exceptions overruled.*
*Judgment on the verdict.*

Appleton, C. J., Cutting, Kent, Dickerson, Barrows and Danforth, JJ., concurred.