# Sullivan v. The State.

*Indictment for Murder.*

1. · *Jury in a capital case; when error to excuse juror for misnomer.*— Where a special statute regulating the drawing and impannelling of grand or petit juries in a particular county provides, that for the trial of a capital felony, the court shall order the sheriff to summons not less than fifty nor more than one hundred persons, including the reg-

[Sullivan v. The State.]

ular juries for the week, from whom the panel for the trial is selected, and that the court is to inquire into and pass "upon the qualifications of all the persons who appear in court in response to the summons to serve as jurors," but that the *venire* is not to be quashed or the cause continued because of a mistake in the name of any juror summoned, it is error for the court on a trial for murder to excuse *ex mero motu* one of the regular jurors of the week for a misnomer as to his christian name, such juror not being adjudged incompetent or disqualified, and not requesting to be excused upon personal grounds which would render his services as a juror oppressive; and such error will be presumed to be prejudicial to the defendant.

2. *Dying declarations; statement of a collective fact admissible.*—To be admissible in evidence, dying declarations must relate to the act or transaction of the killing so as to constitute a part of the *res gestae*; and where the killing was caused by an incised wound, the statement in a dying declaration that the defendant cut declarant, that "he cut me for nothing; I never did anything to him," is admissible as a collective fact, relating to the homicide.

3. *Same.*—As a part of the same dying declaration, the statement, "I pray God to forgive him" (defendant), is inadmissible.

4. *Murder; duty of retreat* —When an assault is made on a sudden quarrel, and a mutual combat ensues it is a duty to retreat, if possible, to avoid the threatened danger, and excusable homicide in self-defense can not be established unless it is shown that the party killing retreated—made some real effort to avoid the necessity of taking life; and an instruction to a jury in a trial for murder, which does not necessitate the inquiry whether retreat, or other effort to avoid the taking of life, was practicable, is properly refused, though it may assert every other fact essential to constitute self-defense.

5. *Murder in the second degree; charge to the jury.*—A charge to a jury that instructs them that "before they can convict the defendant of murder in the second degree, they must be satisfied from the evidence, beyond all reasonable doubt, that the defendant unlawfully cut or stabbed deceased, and that he did the cutting or stabbing willfully or maliciously," asserts a correct proposition of law, and should be given.

6. *Murder and manslaughter; charges to the jury.*—A specific intention to kill is not an essential element of murder; and, malice and formed design being inferable from the use of a deadly weapon, on a prosecution for a homicide with such weapon, charges are erroneous that instruct the jury that, "If two persons fight willingly on a sudden quarrel or provocation, and one kills the other, the statute makes the killing manslaughter in the first degree;" or that, "If one intententionally does an act calculated to take life, and death is unintentionally produced, the homicide is manslaughter in the first degree."

APPEAL from the City Court of Selma.
Tried before the Hon. J. W. MABRY.

[Sullivan v. The State.]

The appellant was indicted and tried for the murder of Wm. L. Emmerson, and was convicted of murder in the first degree, and sentenced to the penitentiary for life.

The facts of the case referring to the exceptions reserved by the defendant to the action of the court in excusing one of the jurors is sufficiently stated in the opinion.

The testimony for the State tended to show that on November 12, 1892, in one of the streets of Selma, the deceased, William L. Emmerson, and two other persons were standing talking; that the defendant came up "holding his hands in front of his waist, his left hand being held over his right," and as he came up facing the three, he said: "We have had a big day to-day." To this the deceased replied: "Yes, you have had several big days, you had one when you shot that man in the leg in front of the market house." The defendant responded: "Yes, g—d—you, I don't have to shoot you in the leg," and at the same time, while standing about two feet from the deceased, the defendant drew a dirk, and plunged it into the breast of the deceased. During all of this time Emmerson was standing still with both hands down by his side in a natural position, had nothing in his hands, and did not curse or make any movement towards the defendant. Immediately after being stabbed, the deceased staggered back and fell, bleeding copiously from the wound, and called for a doctor. The deceased was then moved from the street to a drug store, and died in about 40 minutes after the cutting. The deceased repeatedly said to one of the witnesses that was standing by him, while he was lying on the floor of the drug store, "that he could not live; that he was dying." After this statement, while lying on said floor, the deceased said that "Jim Sullivan cut me; he cut me for nothing. I never did anything to him. I pray God to forgive him for it." The defendant objected to the introduction in evidence of that part of the deceased's statements that defendant "cut him for nothing" and "I pray God to forgive him," and moved the court to exclude these expressions from the jury, on the grounds, 1st that they were merely conclusions of the deceased; 2d, they were the deceased's opinions; 3, they did not relate to the circumstances or transactions of the killing. The court overruled this motion of the defend-

ant, and to this ruling the defendant duly excepted.

The testimony for the defendant tended to show, that upon coming up to where the deceased was standing with two other people, and the defendant addressing the remark to them, as stated above, the deceased replied to him in an angry manner, and cursed him; that the defendant told the deceased he had no pistol, and to go off and let him alone ; that the deceased then started towards the defendant with his left hand raised, and his right hand upon or near his pistol pocket, and when the deceased got near the defendant, the defendant struck at the deceased with his knife, and that the deceased's hand struck the back of the defendant's hand, and drove the knife into the deceased's breast.

The defendant requested the court to give the following written charges, and separately excepted to the court's refusal to give each of them as asked : (1.) "The court charges the jury that if the defendant did not provoke, or encourage the difficulty, but approached the deceased in an orderly and peaceful manner, and the deceased replied angrily, and insultingly, and advanced towards the defendant and placed his hands behind him in such a manner as to indicate to a reasonable man that his purpose was to draw a pistol and fire, the defendant was authorized to anticipate him and stab him ; and the rule in such case would not [be] varied, if it should turn out that the deceased was in fact unarmed, as the law of self-defense does not require the defendant to wait until the weapon is presented ready for deadly execution." (3.) "The court charges the jury that if the defendant did not provoke or bring on the difficulty, but approached the deceased in an orderly and peaceful manner, and the deceased replied angrily and insultingly and advanced toward the defendant with one hand raised and the other placed upon or in the direction of a pistol pocket, in such manner as to indicate to a reasonable man that his purpose was to draw a weapon and use it, the defendant was authorized to anticipate him and cut first." (6.) "The court charges the jury that before they can convict the defendant of murder in the second degree, they must be satisfied from the evidence, beyond all reasonable doubt, that the defendant unlawfully cut or stabbed W. L. Emmerson, and that he did the cutting or stabbing willfully or malici-

ously." (13.) "If two persons fight willingly on a sudden quarrel or provocation and one kills the other, the statute makes the killing manslaughter in the first degree." (16.) "The court charges the jury that if one intentionally does an act calculated to take life, and death is unintentionally produced, the homicide is manslaughter in the first degree." (18.) "The court charges the jury that the danger that will excuse one for killing another need not be real or actual. It may now be known that all the appearances of danger were false, and Emmerson never intended to do defendant any harm, and that he did not have a pistol or other deadly weapon; yet, if the jury believe from all the evidence in this case, that the appearances of danger surrounding the defendant, at the time were such, as to produce a reasonable belief in the mind of defendant that his life was in danger, or that he was about to suffer great bodily harm, and that there was no other reasonable means at the time open to the defendant to avoid the danger, but by taking Emmerson's life—the defendant being without fault at the time—the law holds him harmless, and the jury must aquit him, although Emmerson may have had no pistol or other deadly weapon."

P. H. PITTS, for appellant.—The court erred in excusing the juror Lacy.—Acts 1884–85, p. 498, § 10 ; *Jackson v. The State*, 76 Ala. 26. The court erred in not excusing the parts of the dying declarations which were excepted to.—1 Brick. Dig. 511, § 891 ; *Reynolds v. The State*, 68 Ala. 502. The court erred in refusing to give charges 1, 3, and 18 asked by the defendant.—*DeArman v. The State*, 71 Ala. 351 ; *Storey v. The State*, 71 Ala. 329.

WM. L. MARTIN, Attorney-General, and GEORGE H. CRAIG, for the State, cited *Hornsby v. The State*, 94 Ala. 67 ; *Mitchell v. State*, 60 Ala. 26 ; Clark's Manual Criminal Law, 76, § 480.

BRICKELL, C. J.—The court made an order setting the day of trial, and that, with the persons drawn and summoned as petit jurors for the week, other names should be drawn so as to increase the number to seventy-five, a list of whom were to be served on the defendant. This course was pursued ; and on the day of trial, in

the process of the organization of the jury, the court was inquiring into and passing upon the qualifications of the persons appearing in obedience to the summons to serve as jurors. The name of Theodore Lacy was called, who was one of the regular jurors of the week. He responded, but said that though summoned by the name of Theodore, his true name was Theophilus Lacy. Thereupon, *ex mero motu*, the court excused or discharged him from service as a juror, to which the defendant excepted.

1. The special statute in relation to the drawing and empannelling of grand and petit jurors in the county of Dallas, requires that whenever any person stands indicted for a capital felony, the court must, on the first day of the term, or as soon thereafter as practicable, make an order conforming to section 4874 of the Code of 1876, commanding the sheriff to summon not less than fifty nor more than one hundred persons, including those summoned on the regular juries for the week, from whom the panel for the trial is to be selected. Upon the court, on the day set for the trial, if the cause is ready for trial, is imposed the duty of inquiring into and passing "upon the qualifications of all persons who appear in court in response to the summons to serve as jurors;" and to cause the names of all those whom the court may hold to be competent jurors to try the defendant, to be placed on lists, and to require the defendant to strike off from the lists two names, and the solicitor to strike off one, and this process is continued until only twelve names remain, who are to be sworn and empannelled as the jury. It is further provided, that, "If the sheriff fails to summon any juror drawn, or any juror summoned fails or refuses to attend the trial, or there is any mistake in the name of any juror drawn or summoned, none or all of these grounds shall be sufficient to quash the *venire*, or continue the case."—Pamph. Acts, 1884–85, p. 497.

It is obvious the power the court is authorized to exercise in the process of the organization of the jury, is the inquiry into and determination of the qualifications as a juror of the person appearing in obedience to the summons. It may doubtless reject any or all who may be subject to any disqualification, or who may not have the statutory qualifications. So, it may probably, ex-

cuse or discharge any person because of reasons personal
to himself, which would render service as a juror op-
pressive.  Beyond this, it is not contemplated by the
statute, the power which the court may exercise *ex mero
motu* shall extend.  If there be not an absence of the
statutory qualifications, or a temporary disqualification,
or reasons personal, rendering service as a juror oppres-
sive, the duty of the court is to cause the names of all
appearing to be placed on the lists from which the jury
is to be selected.  A list of all who are to be summoned
to appear, the law requires to be served on the defend-
ant.  The object is, to enable him to prepare for his
challenges; to afford him the opportunity of ascertain-
ing whether causes for challenge exist; to exercise in-
telligently the right of peremptory challenge, and the
power of selection, which the statute confers.—*Parsons
v. State*, 22 Ala. 50.  There should not be interference
with this right further than the statute sanctions. The
juror was not incompetent; there was no disqualifica-
tion; no request to be excused because service would be
oppressive.  The only reason for his discharge was the
misnomer of his christian name ; a misnomer not affect-
ing his identity, for by it he had been summoned, and
to it he responded.  An error which, by the express
terms of the statute, is immaterial ; not ground for
quashing the *venire*, or a continuance of the cause. The
court erred in the discharge of the juror.  The error, it
may be, was not of practical injury to the defendant.  We
deem it safer, however, to adhere to the long settled
rule, that when error is shown, the presumption of in-
jury arises, which must be clearly repelled by the record,
or the judgment will be reversed.—1 Brick. Dig. 780,
§ 100.

2.  After the deceased had received the fatal stab, and
after he had given up all hope of recovery, he made
statements concerning the encounter, which were re-
ceived in evidence against the objection of the defend-
ant.  Such statements—dying declarations—are excep-
tional testimony, and are received from the necessity of
the case ; the circumstances and the solemn surround-
ings being treated as supplying the sanction and restrain-
ing force over the declarant, which a solemn oath im-
poses in ordinary cases.  But the declarant does not
become a general witness.  He can only speak of the

transaction which causes the death, and such accompanying acts, statements and conduct, as shed light on it; the *res gestae*, in a strict sense. Anything previously done or said, unless called up and made part of the altercation, can not be proven as a dying declaration; and when so called up, it can be proved as such, only to the extent it is repeated or uttered in the altercation. It does not legalize any statement by the declarant of the past transaction out of which the difficulty grew. It is only such acts or statement, done or uttered at the time of the final, fatal encounter and catastrophe, and which tend to shed light on it as a part of the *res gestae*, which can be so proved.—*Fonville v. State*, 91 Ala. 39; *Bibb v. State*, 94 Ala. 31; *L. & N. R. R. Co. v. Pearson*, 97 Ala. 211; *Johnson v. State, ante*, p. 1.

Just before Emmerson, the deceased, expired, when he was conscious he was dying, and so expressed himself, he made two declarations, which were offered in evidence as dying declarations. Each was separately objected to, each objection was overruled, the testimony was admitted, and a separate exception was reserved to each ruling. One of the declarations was, "Jim Sullivan cut me—he cut me for nothing—I never did anything to him." The objections made to this testimony were, that it was the conclusion of the declarant—the opinion of the deceased—and that it did not relate to the circumstances or transaction of the killing. There is nothing in this objection. The statement certainly did relate to the act, or transaction of the killing. The killing was effected by means of an incised wound. All the witnesses concur in that. He also said Sullivan cut him for nothing, and that he, the declarant, did nothing to Sullivan. True, this statement was very general, but it was admissible as a collective fact.—3 Brick. Dig. 437, §§ 458, 460, 463, 465. The other part of the declaration was simply a continuation of the former: "I pray God to forgive him." This should have been excluded. It did not, in any way, relate to, or shed any light on the act of killing, or that which apparently led to it.

3. It may be, charges numbered 1 and 18, requested by the defendant, find support in charges which were pronounced correct in *DeArman's Case*, 71 Ala. 351. We are nevertheless constrained, in view of the more recent rulings of this court, to declare that the city court prop-

erly refused to give them in the form in which they were requested. When an assault is made on a sudden quarrel, and a mutual combat ensues, retreat, if possible, to avoid the threatened danger, is a duty. For, as was said in *Commonwealth v. Drum*, 58 Penn. St. 1: "When it comes to a question whether one man shall flee or another shall live, the law decides that the former shall flee rather than the latter shall die."—*Eiland v. State*, 52 Ala. 332; *Pierson v. State*, 12 Ala. 149. There may be cases of murderous assault, or of assault with intent to commit other atrocious felonies, from which it is not the duty of him who is assailed to retreat, or employ any other effort to avoid taking life. But in all cases of sudden combat, to establish excusable homicide in self-defense, it must appear that the party killing had retreated; had made real effort to avoid the necessity of taking life. Any instruction to the jury in such case, though it may assert every other fact essential to constitute homicide in self-defense, which does not necessitate the inquiry whether retreat, or other effort to avoid the taking of life, was practicable, is properly refused.— *Holmes v. State*, 100 Ala. 80; *Webb v. State*, 100 Ala. 47; *Gibson v. State*, 89 Ala. 121; *Cleveland v. State*, 86 Ala. 1. For the like reason, charge number 3 was properly refused.

Charge 6 should have been given. Charges 13 and 16 were rightly refused. The hypothesis of neither of them is a universal truism. Cases falling within each of the postulates might be murder, for there may have been formed design, and the homicide may have resulted from that formed design. If it did, according to their language, no matter how deadly the weapon, nor how directly aimed at Emmerson, yet unless the killing was intentional, the crime could not be of higher grade than manslaughter. In other words, no matter how deadly the blow, or how likely to produce death, yet, unless the jury find there was a specific intention to kill, the homicide is only manslaughter. Manslaughter is the unlawful killing of a human being without malice. Every one must be held to intend the known consequences of an intentional act. When life is taken by the direct use of a deadly weapon, if there be nothing else in the transaction—no justifying or explanatory circumstances— the presumption is that the killing was done pursuant

to a formed design.    Malice may be inferred from the use
of an instrument known to be liable to produce death.—
3 Brick. Dig., 216, § 524; *Hadley v. State*, 55 Ala. 31.
    Reversed and remanded.

HARALSON, J., not sitting.