101 So.2d 564

John Edward BURTON

v.

STATE.

6 Div. 413.

Court of Appeals of Alabama.

Nov. 5, 1957.

Rehearing Denied Nov. 26, 1957.

Selman & Beaird, Jasper, for appellant.

John Patterson, Atty. Gen., and Robt. P. Bradley, Asst. Atty. Gen., for the State.

**334**

CATES, Judge.

About three o'clock in the morning of the night of October 31–November 1, 1955, Bert Richardson, a householder of Mc-Collum, heard a man run up in his yard and holler for help. Getting out of bed, Richardson saw a nearby three-room house on fire and David Borden standing in Richardson's yard with his trouser leg ablaze. Borden's coat was lying on the hillside burning. Richardson went to his help and as he cut Borden's belt in two and jerked his clothes off, Borden told him, "I'm drunk; I don't see why anybody would want to set me afire, I haven't done anybody no harm around here."

Richardson next wrapped Borden in a blanket. Borden tried to walk toward Richardson's car but got only to the edge of the porch saying, "Mister, I have went as far as I can go." Thereupon, Richardson "holp" him to his car and drove to the People's Hospital in Jasper, some three or four miles distant. Mrs. Addison, the night supervisor of nurses at that hospital, testified that Borden's legs were burned from the waist down to his ankles. His hands were doubled up by burns.

After two or three days Borden went by ambulance to the Colbert County Hospital near Sheffield, apparently to be close to his kinfolks, most of whom lived in that county. While in this hospital, he was visited every day by his mother, Mrs. Lecey Borden, who lived in the town of Cherokee where John Burton, the appellant, was

chief of police. Borden told his mother on more than one occasion that "he wasn't going to get well; that he was going to die." This statement was borne out by his death on December 12. Asked when her son had told her of this expectancy of dying, Mrs. Borden answered the solicitor, "That day (when he came to Sheffield) or next day, and then plumb on." "What did he say?" "Mamma, I can't get well; I am burned too bad."

"When you asked him how it (the fire) happened, did he tell you?" "Yes." "Tell these gentlemen (the jury) what he said." Her answer epitomizes the accusation against Burton:

"He told me, 'Mamma, I am going to tell you how it happened,' right to my face; says, 'We put five gallons of gas on the outside of the house and we put five in the house,' and he told me, he said, 'Then we struck the match and throwed it down; that John Burton came out and pulled the door to on me and left me in there and all the way I could get out, I rubbed my hands on the wall, on the door-knob, to get out.'

\*   \*   \*   \*   \*   \*

"A. He just said, 'We was pouring gas; me and John Burton was pouring gas in the house, and it was poured all over me and all over the house and all over the yard. There over the house me and John Burton was pouring the gas out,' and that was when they struck \* \* \*.

"Q. Did you say he said they got the gasoline? A. No, sir, they poured it on him when they was pouring it on the house—both of them pouring it."

Mr. W. A. Roden, a former Colbert County deputy sheriff (being mainly a process server for a justice's court), and who was married to Borden's aunt, was a witness to a similar declaration:

"He said that the man had two five-gallons of gasoline in the car; they stopped at a filling station—I never

heard him say what station—and they got the gas, and they carried it on out, to where he was going to use it here—you know—and he poured half of it on the outside of the house and the rest of it on the inside of the house, and dashed some on him, he said, and he asked him what did he do that for, and he told him, he said, 'I'll show you directly.' Now that's what the boy said.

*   *   *   *   *   *

"A. * * * he said the man went out the door and threw the match in there and pulled the door to; now that's all I heard about that.

"Q. Did he say who the man was?

*   *   *   *   *   *

"A. Yes.

"Q. Who?

*   *   *   *   *   *

"A. Mr. Burton.

"Q. Did he die after that?

*   *   *   *   *   *

"A. Yes; yes."

Borden's sister, Louise Hill, told of visiting him in the hospital. Mrs. Hill's account of Borden's declaration ran:

"Q. Did you visit him in the hospital before he died? A. Yes.

"Q. Do you know how long he was in the hospital? A. About six weeks; he was in there from the 1st day of November until the 12th of December.

"Q. How many times did you visit him? A. I don't remember just how many times; I was there from two to three times a week.

"Q. During the times you visited him there, did he ever make a statement to you with reference to how he got burned?

*   *   *   *   *   *

"A. He just said he was burned; that was all.

*   *   *   *   *   *

"Q. * * * Did he say anything to you about how he got burned? A. Just said he burned in the house.

"Q. Did he say anything about how he got burned? Did he tell you how he got burned? Yes or no.

*   *   *   *   *   *

"A. Yes.

*   *   *   *   *   *

"Q. Did he tell you that once or more than once?

*   *   *   *   *   *

"A. Just told me that once.

"Q. How long was that before he died?

*   *   *   *   *   *

"A. It was about a week and a half or maybe two weeks; about a week and a half after he got burned.

"Q. Of course there in the Colbert County Hospital, was it?

*   *   *   *   *   *

"A. Yes.

"Q. Was anyone else there?

*   *   *   *   *   *

"A. Not when he told me.

"Q. Was anyone there immediately before he told you?

*   *   *   *   *   *

"A. My husband.

"Q. Before he said what he did about how he got burned, did he say anything to you at that time or immediately afterwards or during the statement that you say he made about whether he thought he would live or die?

*   *   *   *   *   *

"A. Yes, sir.

"Q. Did you hear him there at the hospital say anything about whether he would live or die?

*   *   *   *   *   *

"A. Yes, sir.

"Q. When was that with reference to the statement you say he made?

\* \* \* \* \* \*

"A. About a week and a half after he was burned.

"Q. Did he say anything about whether he thought he was going to live at the time he told you how he got burned?

\* \* \* \* \* \*

"A. (no answer)

"Q. You told us there that your brother told you or made a statement about how he got burned, about a week and a half after he went in the hospital, didn't you?

\* \* \* \* \* \*

"A. Yes, sir.

"Q. At that time he made that statement, immediately before or after he made that statement, did he say anything to you about whether he thought he would live or die or get well?

\* \* \* \* \* \*

"A. No, sir, not after that.

"Q. Did he say anything about that before he made the statement?

\* \* \* \* \* \*

"A. No, sir.

"Q. Did he say anything about it after he made the statement?

\* \* \* \* \* \*

"A. No, sir.

"Q. Did he ever say anything to you in that hospital about whether he would live or die or get well?

\* \* \* \* \* \*

"A. Yes, he said he would die, that he wouldn't get well.

"Q. When did he say that?

\* \* \* \* \* \*

"A. About a week and a half after he was burned.

"Q. Was it before he made that statement that you referred to, or after?

\* \* \* \* \* \*

"A. That is when it was, when he told me.

"Q. That is what I am asking you. What did he say?

\* \* \* \* \* \*

"A. Well, he just—After he told me how he got burned he said, 'Sister, I know I can't ever get well.' \* \* \*

\* \* \* \* \* \*

"Mr. Wilson: Go ahead, don't tell what you said; tell what he said. A. (continuing) He said, 'I know I can't get well.' He said, 'I'm going to die,' he said, 'because I am burned up.'

"Q. Did he say anything else?

\* \* \* \* \* \*

"A. No, sir.

\* \* \* \* \* \*

"Q. \* \* \* What did he say about how he got burned?

\* \* \* \* \* \*

"A. He said he was—they was gassing the house, him and John, and he said that John poured gas on him when there was gas in the house, and I asked him how did he get out, and he said he had to feel around the wall until he come to the knob on the door before he could get out.

"The Court: Did he say who that was? You said 'John'.

"The Witness: John Burton."

Burton and Borden were both seen together at the State Line Cafe some miles west of Cherokee at between eleven and midnight of October 31. Bobbie Knight related that at a time which he judged to be between one or one-thirty in the morning of November 1, Burton ran him and

another Halloween celebrant off the streets of Cherokee. A short time later they again saw Burton driving toward his home.

Coy Robbins, working the eleven-to-six-in-the-morning shift at the K. O. Service Station four miles west of Tuscumbia on U. S. Highway 72, testified that about one-fifteen in the morning of November 1, Burton, Borden, and a red headed woman drove up in Burton's car. The two men were drinking. Burton asked Robbins if he had anything to put some gasoline in. Robbins found two two-gallon oil cans and Borden put gasoline in them. Burton paid Robbins, and put the gasoline in the trunk of the car. Both men got back in the car, which Burton was driving, and sped off toward Tuscumbia—away from Cherokee. Under the State's reconstruction of this holocaustic Halloween, this was the last appearance of Burton and Borden until 3:16, at which time the prosecution would put them in McCollum, there going about the firing of a house owned by Burton and his wife and rented to Borden.

Burton was, on January 28, 1956, indicted of aggravated first degree arson, i. e., the indictment charged the burning produced "the death or maiming of David Borden." See Code 1940, T. 14, § 23. The trial began February 20, 1956.

The evidence in support of Burton's plea of not guilty was in the nature of alibi, i.e., Burton was at the State Line Cafe on U. S. Highway 72 west of Cherokee at the Alabama-Mississippi boundary at the time the State sought to show he was driving to McCollum and setting the house and Borden on fire. Also, and to show that Borden was the sole arsonist, he put Borden's widow on the stand. Mrs. Borden testified as to her husband having rented the house from Burton at the time the latter had hired Borden to drive Burton's coal hauling truck. No rent was charged because the men made allowance for the use of the house in figuring the division of profits when the coal would be sold. On October 31, Borden had left home about six in the morning telling her he had a load of coal

to take to Huntsville. That night about ten o'clock, her husband being still away, she took herself and her two infants to the adjoining home of Mr. Price Burton, appellant's father. It was here that she learned of the fire and her husband's being burned. At the People's Hospital, he told her of being drunk and striking "the match that set him on fire."

Her cross examination elicited, among other things, the following:

"Q. The reason that you never asked your husband if he burned that house down there was because you knew he burned the house, didn't you? A. No, sir. Yes, sir.

"Q. He told you ahead of time that he was going to burn that house, didn't he? A. Yes, sir.

"Q. And John Burton here was going to give him fifty dollars to burn that house and they were going to put up a coal yard in Cherokee with the insurance money and they were going in halvers on it, didn't he? A. No, sir.

"Q. You say that didn't happen? A. No, sir.

"Q. You told that to half a dozen different people, haven't you? A. No, sir.

"Q. You made statement to Mr. Hooper, the State Fire Marshal, didn't you? A. Not that he was going to give him fifty dollars.

"Q. And you signed that statement, didn't you? A. No, sir, not that he was going to give him fifty dollars.

"Q. Is that your signature right there? A. Yes, sir.

"Q. You made that up there on the 19th day of January, 1956, didn't you? A. Yes.

"Q. You made it in the presence of John Hooper, Donald Files, Paul

Mayes, and this fellow Dobbs, didn't you? A. Yes, sir.

"Q. And you had heard David say several days before that that he was going to burn that house? A. Yes, sir.

"Q. And that John Burton was going to pay him fifty dollars to burn it, didn't you? A. No, sir.

"Q. You say that didn't happen? A. No, sir. I didn't hear him say he was going to give him fifty dollars.

\*  \*  \*  \*  \*  \*

"Q. You told Mr. Hooper when he questioned you up yonder, 'I do not want to go on the stand and tell what I know because I don't know what his people might do to me?' A. Yes, sir.

"Q. You told him that, didn't you? A. Yes, sir.

"Q. And that is the reason you are up here testifying now, isn't it? A. Yes, sir.

"Q. John Burton has talked to you since this house has burned, hasn't he? A. No, sir.

"Q. You say that he hasn't talked to you since this house burned and named to you about the house burning? A. Yes, sir, he did one time; he said me or him one was going to get in trouble over it.

"Q. And he also told you that if he were you he wouldn't talk any more about this house burning—and if John didn't say something—that there were going to be some more murders in this case? A. No, sir.

"Q. You say that he didn't say that? A. No, sir.

"Q. He told you that you or him one was going to get in trouble, didn't he? A. Yes, sir.

"Q. And he said it wasn't going to be him, didn't he? A. Yes, sir.

"Q. And that is the reason you have come down here to testify for him, isn't it? A. No, sir.

"Q. You told Mr. Hooper you hadn't made this statement before because you were afraid of John, didn't you? A. No, sir.

"Q. You say that you didn't say that? A. No, sir.

"Q. How long before this house burned did David tell you he was going to burn it? A. About two or three days.

"Q. Two or three days before it burned? A. Yes, sir.

"Q. And he told you that out in John's house, didn't he? A. Yes, sir.

"Q. And he said, David told you, that him and John were going to burn the house, didn't he? A. Yes, sir.

"Q. And they burned it, didn't they? A. Well, I wouldn't say.

"Q. Why you were out there when they burned it, weren't you? A. No, sir.

"Q. You tell these gentlemen on the jury you weren't out there that night? A. Yes, sir.

"Q. You tell these gentlemen you left that house out there at 10 o'clock and went up to John's daddy's? A. Yes, sir.

"Q. You never had done that before? A. No, sir.

"Q. You never had been in Price Burton's house before, had you? A. Yes, sir.

"Q. You never had spent the night there before? A. No, sir.

"Q. You say the house burned about three o'clock? A. Yes, sir, 3 or 3:30.

"Q. And you were up there at that time, weren't you? A. At Mr. Burton's.

"Q. And the police came up there looking for you, didn't they? A. Yes, sir."

When the State has made a prima facie case of the crime charged or any necessarily included charge, any conflict in the weight or credibility of the testimony presented by both sides becomes the problem for the jury in its deliberations. Upon a consideration of the evidence, we conclude the State submitted sufficient evidence to take the case to the jury on the first count of the indictment. The trial judge correctly charged out the other count which was predicated on Burton's burning his own house with fraudulent intent (to collect insurance). The "property" being laid in Borden, the tenant, did not taint the first count since arson, insofar as the ownership of the burned property is concerned, is an offense against possession rather than against title or interest not coupled with possession, Adams v. State, 62 Ala. 177 (properly laid in a co-tenant in actual occupation without reference to other); Balkum v. State, 28 Ala.App. 557, 190 So. 290.

Since the indictment charged Burton with burning a dwelling and thereby producing the death of Borden, we consider the declarations made to his mother, sister and uncle as admissible. We are cognizant of cases not permitting the reception of dying declarations, e. g., Johnson v. State, 50 Ala. 456 (declaration of girl killed inadmissible on carnal knowledge charge), Hood v. Pioneer Mining & Manufacturing Co., 95 Ala. 461, 11 So. 10, Yates v. Huntsville Hoop & Hdg. Co., 39 So. 647, and O'Bar v. Southern Life & Health Ins. Co., 232 Ala. 459, 168 So. 580 (civil cases).

However, the charge here fits analytically in a category of no less than a kind of manslaughter, and since a punishment for the aggravated felony would have been either electrocution or life imprisonment, the gravity of the accusation would, if we believe the reasoning of the common law,

be as likely to make a declarant speak only the truth. Nor do we think this result to be novel. Thus, in cases of statutes which constituted graver degrees of abortion where the operation killed the woman, the courts of Indiana and New Jersey arrived at the same conclusion.

"Is the offence any the less homicide because of the prosecution being under one statute rather than another? Is the manner of the death any the less the subject of investigation than it would have been if the indictment had charged manslaughter or murder? The case is entirely unlike a prosecution solely for producing an abortion; there death is not a material element of the offence; here it is. In the class of cases referred to death is no part of the body of the crime. In the case in hand the statute expressly makes it an essential ingredient, and the manner of the death is an important and controlling enquiry. All the statutory elements of an offence must be charged, and they must be proved as charged. The State v. Wright, 52 Ind. 307. As the indictment charged that death resulted from the wrongful act, and as death is a statutory element of the charge, it became the direct subject of investigation.

"If the statute had in express terms declared that the offence should be deemed murder or manslaughter, the evidence would have been competent. Can it make any difference that the statute either gives the offence no name or names it something else than murder or manslaughter? Courts are to look to the substance of the offence defined; they are not to be guided by mere names. If, in reality, the offence is homicide and the subject of enquiry the manner of the deceased's death, the settled rules of evidence which prevail in such cases should be enforced. * * *" Montgomery v. State, 80 Ind. 338. See also State v. Meyer, 65 N.J.L. 237, 47 A. 486.

■ We consider the evidence (not only the testimony of the spokesmen for the absent Borden but also the extent of Borden's burns) showed the preliminary requisites to admission of a dying declaration were met, viz.:

a) The prisoner must be on trial for the death of the declarant and the statement must relate to the cause of his death; and

b) The declarant, when making the statement, must have been in settled, hopeless expectation of impending death.

As to death being remote from the time of burning, by way of dictum a declaration of a man who lingered two months was considered admissible in Boulden v. State, 102 Ala. 78, 15 So. 341. See also Booth v. State, 247 Ala. 600, 25 So.2d 427.

■ Borden's declaration being that of a co-felon, requires corroboration. This may be but of a single act, yet it must not be far fetched. Smothers v. State, 38 Ala.App. 153, 83 So.2d 374. The State here relies on (a) the testimony of Robbins as to the purchase of the gasoline and driving off away from Cherokee with Borden; (b) on the testimony of a policeman that the entire house seemed to be ablaze all at the same time; and (c) on the testimony of a fireman that the door and window panes of the house were blown out into the yard, and his opinion that there had been an explosion.

■ While the foregoing may have been pluralistic in implication, yet each act or circumstance was substantial within the test of Sorrell v. State, 249 Ala. 292, 31 So.2d 82. Thus, in Fuller v. State, 34 Ala.App. 211, 39 So.2d 24, an offer by the defendant to pay for the stolen logs was held sufficient. In Fagan v. State, 35 Ala.App. 13, 44 So.2d 634, the presence of the defendant at a meeting with his two alleged confederates and a showing of the tracks of three men in a pasture corroborated the accomplice's testimony of cattle rustling. Seeing the defendant drive along a dead end road which went up to a still was enough in Smothers v. State, supra. The admission of the accomplice's testimony (i. e., the dying declaration) and of the further evidence just mentioned to connect Burton with the crime in no wise diminishes the burden of proof resting on the State but merely indicates that prima facie the trial judge considers the prosecution has offered the semblance of the added evidence required by the statute (Code 1940, T. 15, § 307) before the jury can deliberate, Slayton v. State, 234 Ala. 9, 173 So. 645. (dictum).

■ After the trial judge's oral charge, the defendant took exception to the court's therein calling Borden the "owner" of the house for the purposes of the arson statute and under the indictment and in other statements of like import. What we have said above about possession of the premises suffices to uphold our belief there was no error in this aspect. Burton's brief quite correctly does not assign error in the action of the court below refusing charges proferred.

We have examined the entire record consisting of some 600 pages and conclude that there was no substantial error prejudicial to Burton committed on the trial.

It results, therefore, that the judgment which is agreeable to a verdict of guilt of simple first degree arson and the concomitant sentence of Burton by the trial judge to fifteen years' imprisonment in the penitentiary is due to be

Affirmed.