ON REHEARING
CATES, Judge.
Obedient to the mandate of Code 1940, T. 13, § 66, and cognizant that long opinions on settled law represent a hidden tax on the lawyers who subscribe to the official and Southern Reporter, on August 24, 1976, we affirmed — after review under T. 15, § 389— the judgment of conviction without opinion.
Under Rule 39(k) ARAP as explicated in Ex parte Phelps v. State, Ala., 339 So.2d 124 (1976), we are asked to accept the following as a fair statement of facts:
“In the early evening of October 17,1974, Mitchell, his brother Roy Marshall Mitchell (hereinafter referred to as ‘Mitchell’s brother’), Mitchell’s wife and one Ralph Leslie Dye, Jr. set out from Irondale, Alabama in Dye’s car for the purpose of finding the estranged wife of Mitchell’s brother. (R. 23-25) The wife of Mitchell’s brother was apparently living in the West End section of Birmingham as this is the area to which they drove. (R. 24)
“Upon arriving in West End, the plan to find the wife of Mitchell’s brother was abandoned and the Mitchell brothers discussed going to the home of Robert Major Collins, Jr., the deceased. (R. 25) Mitchell’s brother and Collins had been close friends for several years and had gone around together. (R. 88, 96) (Sometime prior to this night, Collins had informed the police about some crime which Mitchell had allegedly committed.) (R. 25) During the ride one or both of the Mitchell brothers (it is not clear which) discussed going to the home of Collins for the purpose of pursuading him to drop charges (according to Mitchell (R. 88)) or for the purpose of ‘whupping him’ (according to Dye (R. 26)).
About 7:15 that evening Mitchell, Mitchell’s brother, Mitchell’s wife, and Dye arrived in Dye’s car at 628 Tenth Street Southwest, Birmingham, Alabama, the home of Robert Major Collins, Jr. (R. 30) A light was on in the Collins house and the front door was open. (R. 29) While Dye and Mitchell’s wife remained in the car, Mitchell’s brother, followed by Mitchell, left the car and walked to the front door of the Collins’ house. (R. 29, 30) Neither was carrying a weapon of any kind. (R. 36, 37, 49, 87, 88) Mitchell’s brother reached the front porch first and entered the open door. (R. 30) When Mitchell reached the door, he was told to come in by Collins. (R. 89, 90, 91) Upon entering, Mitchell saw his brother and Collins sitting on the edge of a table. (R. 90) As Mitchell approached, Collins brought up a gun from behind his leg. Mitchell’s brother grabbed Collins’ arm as he shot. (R. 89, 91, 92) Mitchell, believing his brother had been shot, went toward his brother and Collins. (R. 89) Collins then shot Mitchell twice, first in the stomach and then in the arm. (R. 89) Mitchell, his brother and Collins struggled for the gun, all three falling to the floor in the process. (R. 98) Collins then shot Mitchell a third time in the hand. (R. 89) By biting Collins on the hand, Mitchell got hold of the gun, and tried to get up. Collins and Mitchell continued to wrestle for the gun and the gun discharged, hitting Collins in the chest. (R. 89, 90, 99)
“Upon hearing the first shots, Dye, who had remained in his car, drove approximately one block, and turned into an alley which ran behind the Collins house. (R. 31, 32) About that time he heard a couple of more shots. (R. 33) Mitchell’s brother then ran out of the house and came to the car. (R. 34) Shortly thereafter Mitchell came out of the house and, being weakened from his multiple wounds, fell down in the yard. (R. 34) Mitchell’s brother left the car, picked up Mitchell, and carried him to the car. Dye drove Mitchell to the West End Baptist Hospital and left him. (R. 35, 36)
*929 “After exiting from the hospital, Mitchell’s brother showed Dye a gun. Mitchell’s brother threw the gun into an alley near the hospital. (R. 36, 37) The gun was subsequently recovered by police and a ballistics test showed that the fatal shot came from this gun (R. 9); it was Collins’ gun.
“When the police arrived at the scene they found Robert Major Collins, Jr., lying in the front yard. (R. 80) He had a bullet wound in the chest (R. 82), a cut and a bruise on his face, and a bite mark on his chest. (R. 84) He was conscious. Before being taken to an ambulance, Collins told a policeman that the Mitchell brothers came to his house to get even with him, that a fight ensued, that he, Collins, got his gun and shot Mitchell and that the Mitchell brothers then got the gun and shot him. (R. 83) At another point in this conversation he said that it was Mitchell who had shot him. (R. 83) Collins was then taken from the scene in an ambulance and was pronounced dead on arrival at the hospital. (R. 8)
“An autopsy of Robert Major Collins, Jr. revealed that the cause of death was a gunshot wound to the chest. (R. 6) There were powder burns about the wound. (R. 5) The left eye of the deceased was blue and swollen and there were bite marks on the chest and on the back of his left hand. (R. 6)
“The incident occurred around 7:15 P.M. (R. 30) About 11:30 P.M. the same night, the brother of Robert Major Collins, Jr. came to the house and upon going to the front door found the lock pulled away from the door. (R. 17) That was the first time he had ever noticed the door being in such condition. (R. 19, 20)”
To the foregoing statement the State in its original brief rejected any imputation that the gun in the firing of the fatal shot was discharged accidentally.
Also, the ensuing delineation of evidence must be taken into consideration.
The deceased Collins gave a dying declaration. First, a hearing was had with the jury withdrawn. Compare Jackson v. Den-no, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908. Then the trial judge indicated that the State’s witness’s recital of Collins’ dying declaration was admissible. See Burton v. State, 39 Ala.App. 332, 101 So.2d 564, headnote 5.
The essence of the declaration was:
“Yes, sir, he said that Denny Mike [appellant] * * * he said Denny Mike and Marshall Mitchell came into his house to get even with him, they said, for setting them up for getting a bust for breaking into his house. And he said they were beating him up and he got his gun and shot Denny Mike and they got the gun and shot him.”
The appellant testified in his own behalf. On direct he deposed:
“ * * * I thought he [Collins] had shot my brother. I got closer and tried to break it up and the second and third shot hit me.
Q Where did the second shot hit you?
A The second hit my arm.
Q Where did the third shot hit you?
A The second hit my stomach, the third shot hit my arm.
Q All right. What happened next?
A Then I tried to get the gun of his hand. They was on the floor wrestling. I seen the gun laying out there in the open and I fell on his arm and pinned his arm to the ground and had hold of the gun, the barrel of the gun. He shot again. It went off in my hand, ripped my hand. I could not get away from him no other way so I decided to bite him. So I bit him on the hand. He let go of my arm and I got possession of the gun. I tried to get up. He reached and grabbed my arm and we was wrestling over the gun and it went off and I was still shot.
Q Do you remember what happened then?
A Yes sir, I got up and I tried to make it outside and started out of the house and I could not breathe, could not catch my breath, I felt myself weak so I fell on the front porch and my brother came running
*930 On cross the questions and answers in part went:
“Q Was it [the gun] in your hand or his hand when it went off?
A I had the gun.
Q In your hand?
A Right.
Q Did you step back away from him and shoot him?
A No, sir, we were on the ground. I was trying to get up. He grabbed my arm trying to get the gun back.
Q And you shot him?
A No, sir, it went off fighting on the ground.
Q Did you cock the the hammer back on it?
A No, sir.
Q You just had your finger around it, didn’t you?
A All I know, I had hold of the gun when he grabbed for it.”
if: * * * * *
“Q How long did you have to bite his hand before he turned loose of the gun?
A Five minutes, I guess, maybe two.
Q Three to five minutes?
A He wasn’t going to let go of the gun. He was trying to shoot the last shot, I guess. I was trying to get it out of his hand.
Q Did he ever shoot the gun while you had his hand in your mouth for five minutes?
A He shot it when I got hold of the barrel.
Q I am talking about when you had his hand in your mouth, did he ever shoot?
A While I was biting his hand, no sir.
Q You had his hand five minutes?
A Three minutes. He couldn’t have.
Q He could have shot it?
A No, sir, he could not have.
Q Had it in his hand?
A Had his arm pinned to the ground with both hands.
Q He had his finger in the trigger?
A No, sir, I had done prized it loose.” ******
“Q He was shot in the left side? Do you recognize that bite mark on his left hand?
A Yes, sir, I know I bit him on the hand.
Q Is that the hand you bit him on?
A It could have been. I know I bit him on one of his hands.
Q That was the left hand, right there?
A I don’t know which hand I bit him on.
Q You can look at that body and tell whether it is right or left?
A Yes, sir.
Q Which hand is it?
A It is left.
Q He did not have the gun in his left hand, did he?
A I do not know which hand. I know I bit one of his hands.
Q I offer State’s Exhibit 10 into evidence.
THE COURT: There being no objection, it is in.
(WHEREUPON, said exhibit previously marked State’s Exhibit 10, for identification, was marked in evidence by the court reporter.)
Q I would like for you to look at State’s Exhibit 2. Can you tell if that is Bobby?
A Sir?
Q Can you tell if that is Bobby?
A By his beard, maybe. It looks like him.
Q Do you recognize those bite marks on him?
A Yes, sir.
Q Can you tell better from that picture which hand it is? The left hand?
A Yes, sir.
Q He never had the gun in his left hand, did he?
*931 A Yes, sir, that is the hand he had the gun in.
Q Well, you said earlier he was sitting on a table like this; your brother was sitting here; he reached out and pulled out the pistol and shot at you and your brother grabbed his hand; from there you all struggled until you bit his hand and took the gun out of it and that was the right hand, wasn’t it?
A The hand that was bit was the one he had the gun in.
Q When, during the struggle, did he change hands and put the gun from one hand into the other hand?
A I do not know whether it was his right or his left. I do know which hand the gun was in.
Q Well, you testified earlier you remembered—
A I said I think it was in his right hand.
Q He never changed hands? He never put the gun from one hand into the other hand, did he?
A I did not see it if he did.
Q And he did not have a gun in his hand when you bit him, did he?
A Yes, sir, he did.”
“Q How long had you had the gun in your hand before you shot Bobby?
A A couple of seconds before he — right as I got it. He was fighting for it back.
Q Were you standing up or lying down?
A I was on the floor on his arm when I got the gun.
Q Which arm were you on?
A Sir?
Q Which arm were you on?
A I do not even remember.
Q And you had already been shot in the stomach when you got the gun away from him?
A Yes, sir.
Q Was he lying down when you shot him?
A Sir?
Q Was he lying down or standing up when you shot him?
A We were both on the ground.
Q Was your brother on top of him, too?
A No, sir, he was over on the floor somewhere. I do not remember seeing him.
Q Was he lying beside him or on top of him or what?
A He could have been on top of him.
Q You do not remember?
A I do not know.
Q Did you know whether or not your brother was in the line of fire when you shot?
A No, sir.
Q You put the gun right up close to him, didn’t you?
A I had the gun and he was fighting for it back and all I know was it went off.
Q When he was fighting for the gun back, you had it right up against his chest, didn’t you?
A I was on the ground on top of his arm.
Q Did you have the gun sticking right up next to his body?
A No, sir.
Q How far away from it was it?
A I guess a foot or so.
Q A foot or so?
A Yes, sir.
Q Well, did you see powder burns on his jacket? On his body?
A I did not even know he was shot.”
Exhibits 2 and 10, colored photographs[1], clearly show the fatal wound went into the rib cage (between the seventh and eighth ribs) on the rearward left side of Collins’ body, the bullet ranging slightly upward, lodged in the tissue next to the tenth vertebra. For him to have had the gun in his *932 (Collins’) left hand when he was shot would have involved a well high impossible contortion.
I
Our criminal homicide statutes Code 1940, T. 14, § 314 (murder), § 320 (manslaughter) when applied to §§ 317 and 318 (as to murder) and § 320, supra, and § 322, as to manslaughter confide the finding of degrees of guilt vel non and of punishment to the discretion of the jury.
In the case of instant concern the only step taken to raise the sufficiency of the evidence by trial counsel (who is not representing Mitchell on appeal) was to move, at the close of the prosecution’s case, to exclude the evidence. We consider that there was enough proof to let the case go to the jury.
No exception was taken to the oral charge, no written affirmative charges of acquittal were offered as to any of the four grades of homicide. Williams v. State, 18 Ala.App. 438, 93 So. 55, does not apply.
Malice aforethought is an indispensable ingredient of common law, i. e., statutory second degree murder. Mitchell v. State, 60 Ala. 26. Evidentiary rules permit an inference of a killer’s being in the grip of malice when he intentionally uses a deadly weapon unless the evidence refutes the presumption. The presumption shifts the burden of persuasion to the defendant, that is, it makes a prima facie proof of malice by the prosecution. Allred v. State, 55 Ala.App. 74, 313 So.2d 195. See also, Hornsby v. State, 94 Ala. 55, 10 So. 522.
Under Mullaney v. Wilbur, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508, the reasonable doubt standard of In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368, requires the prosecution to prove beyond a reasonable doubt that the killing was not done in “heat of passion.” In other words, after there is a prima facie case of murder there is no burden on the defendant to prove the killing was manslaughter, i. e., without malice. No ruling in the trial court could have been cited as to this principle because nowhere in the charge to the jury was there any hint that the defendant was required to “tone down” an apparent murder to manslaughter. See Stone, J., in Mitchell v. State, 60 Ala. 26, 32.
We consider the evidence was enough to allow the jury to determine the degree of guilt, if any, or excuse from self defense.[2] Essentially the question boiled down to whether the defendant in concert with his brother, or alone, shot a disarmed man in the latter’s home, or was Collins still a menance to Mitchell’s life in a cul de sac from which he, Mitchell, could not retreat. We note the State adduced proof from which the jury might infer that Mitchell and his brother went to Collins’ home to “whip up” on him. Basically, it was all a question of fact and intent: the jury is and has to be sovereign. Curtis, The Trial Judge and the Jury, 5 Vand.L.R. 150 (1952).
The affirmance will stand; the application for rehearing is overruled.
OPINION DELIVERED; APPLICATION OVERRULED.
All the Judges concur.

. See Anno. 73 A.L. ..2d 769 at 811 and 12.

. “ * * * When an assault is made on a sudden quarrel, and a mutual combat ensues, retreat, if possible, to avoid the threatened danger, is a duty. For, as was said in Comm. v. Drum, 58 Penn.St. [1] 9: ‘when it comes to a question whether one man shall flee, or another shall live, the law decides that the former shall flee rather than the latter shall die.’ — Eiland v. State, 52 Ala. 332; Pierson v. State, 12 Ala. 149. There may be cases of murderous assault, or of assault with intent to commit other atrocious felonies, from which it is not the duty of him who is assailed to retreat, or employ any other effort to avoid taking life. But in all cases of sudden combat, to establish excusable homicide in self-defense, it must appear that the party killing had retreated; had made real effort to avoid the necessity of taking life. * * * ” — Sullivan v. State, 102 Ala. 135, p. 143, 15 So. 264, p. 267